UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
www.flsb.uscourts.gov

| | |
|---|---|
| In re | ) Case No. 10-27532-BKC-LMI |
| | ) |
| First Foliage, L.C., | ) Chapter 11 |
| | ) |
| Debtor. | ) |

**APPLICATION OF UNITED GROWERS, LLC FOR ALLOWANCE AND PAYMENT OF AN ADMINISTRATIVE EXPENSE CLAIM PURSUANT TO 11 U.S.C. § 503(b)**

**(Hearing Requested: February 7, 2011 at 3:45 p.m.)**

United Growers, LLC ("United"), by and through its undersigned counsel, hereby files this application (the "Application") for entry of an order pursuant to section 503(b) of title 11 of the United States Code, 11 U.S.C. §§ 101, et seq. (the "Bankruptcy Code") for allowance and payment of an administrative expense claim in the aggregate amount of $154,617.19 (the "Administrative Claim"), consisting of (i) $92,405.19 in fees and expenses incurred by White & Case LLP ("W&C"), (ii) $56,416 in fees and expenses incurred by Moore Colson, and (iii) $5,796 in fees and expenses incurred by TN Partners, for recovery of the actual reasonable fees and expenses incurred by United in making a substantial contribution to the above-captioned chapter 11 case (the "Case") of First Foliage, L.C. (the "Debtor"). In support of the Application, United submits the declaration of Charles Hanemann, attached hereto as Exhibit "A", and respectfully states as follows:

## BACKGROUND

1. On June 23, 2010 (the "Petition Date"), the Debtor filed its voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the Southern District of Florida.

2. Beginning in September 2010, the Debtor retained Bayshore Partners, LLC, the broker dealer affiliate of Farlie Turner & Co. ("Bayshore Partners"), in order to assist the Debtor in evaluating and implementing various financial and strategic options, including restructuring the Debtor's capital structure, a recapitalization or sale of the Debtor's business and related assets.

3. Bayshore conducted an extensive marketing process, contacting over 200 parties, including potential strategic buyers operating within the Debtor's industry as well as private equity firms and various lending institutions. Bayshore transmitted detailed instructions to interested parties with respect to bidding procedures and submission of written indications of interest in connection with the acquisition of substantially all of the Debtor's assets (the "Assets").

4. On November 29, 2010, United submitted a letter of intent to purchase the Assets, and thereafter commenced negotiations to serve as a stalking horse bidder. After analyzing the offers of all interested parties, the Debtor in consultation with its counsel and advisors, determined that the offer by United provided the greatest value to the Debtor and its creditors.

5. In late December 2010, representatives of the Debtor and its advisors met with United's representatives and explained that the Debtor had a very narrow window of time before it expected to run out of cash. The Debtor urged United to expedite its diligence process and preparation of sale transaction documents, with the understanding that the Debtor would seek stalking horse protections for United. Accordingly, United immediately engaged W&C, Moore Colson, and TN Partners for legal, accounting, and tax services, respectively, worked through the holidays to accommodate the Debtor's urgent

timetable and, on December 26, 2010, submitted a draft asset purchase agreement to the Debtor.

6. Following extensive diligence and arm's length, good faith negotiations over both price and contract terms, on January 6, 2010, the Debtor and United entered into a stalking horse agreement for the purchase and sale of the Assets (the "Stalking Horse Agreement").

7. On January 7, 2010, the Debtor filed its Emergency Motion for Entry of (I) an Order (A) Authorizing and Approving Bidding Procedures for the Sale of Substantially All the Debtor's Assets; (B) Approving Form of Purchase Agreement, Including a Break-Up Fee; (C) Scheduling an Auction and Final Hearing to Consider Approval of the Sale; (D) Approving Form and Manner of Notice of Bidding Procedures, Auction and Sale Hearing and (II) an Order Authorizing (A) Sale of the Debtor's Assets Free and Clear of All Liens, Claims, Encumbrances and Other Interests, and (B) Assumption and Assignment of Certain Executory Contracts and Unexpired Leases [C.P. # 204] (the "Motion"). The Motion sought approval of, among other things, the Stalking Horse Agreement, bidding procedures and an auction process to allow the Debtor to seek a higher and better purchase offer for the Assets, as well as a break-up fee to compensate United for serving as the stalking horse bidder.

8. On January 11, 2010, the Official Committee of Unsecured Creditors (the "Creditors' Committee") filed an objection to the Motion, and on January 12, 2010, Bank of America, N.A., for itself and as the agent to the prepetition senior, secured lenders to the Debtor (the "Bank") and the United States Trustee (the "UST" and, together with the Bank and the Creditors' Committee, the "Objecting Parties") each filed limited objections to the Motion.

9. United worked diligently with the Debtor to resolve many of the objections asserted by the Objecting Parties and, with the assistance of counsel, prepared and circulated an amendment to the Stalking Horse Agreement to address such objections on the evening of January 12, 2010.  Additionally, during the hearing on the Motion (the "Hearing"), United agreed to limit its break up fee to actual expenses incurred and clarified that United's entitlement to the break up fee would be contingent upon full commitment to the Stalking Horse Agreement and being ready, willing and able to close.

10. The Hearing was scheduled for 9:00 a.m. on January 13, 2010.  At the request of the Debtor, the Court provided the parties additional time to continue negotiating the terms of the Stalking Horse Agreement and relief sought in the Motion.  During this time period, the Creditors' Committee informed the Debtor, the Bank and United that it had negotiated a new stalking horse agreement (the "Competing Agreement") with BFN Growers, LLC (the "Competing Bidder"), one of the parties that had been contacted in connection with the Debtor's prior marketing process, and that it intended to seek approval of the Competing Agreement in place of the Stalking Horse Agreement.

11. The Competing Agreement provided the same cash purchase price and, with the exception of a handful of changed terms, was identical in both form and substance to the Stalking Horse Agreement agreement prepared by counsel to United.

12. In light of the Creditors' Committee's last minute revelation to other parties of the existence of the Competing Agreement, the Court continued the Hearing to 1:30 p.m., during which time the Creditors' Committee negotiated with the Bank to obtain its support for the Competing Agreement over the Stalking Horse Agreement proposed and supported by the Debtor.  Given such consensus between the Creditors' Committee and the

Bank, and the Debtor's dire need to expedite the sale process before running out of cash, the Debtor asked United if it would consider waiving any claim against the Debtor, its estate, and advisors under the Stalking Horse Agreement so as to allow the Debtor to seek approval of the Competing Agreement in lieu of the Stalking Horse Agreement. United agreed to this request, with the exception of reserving its right to seek a substantial contribution claim for reimbursement of its expenses. As stated by Debtor's counsel on the record of the Hearing:

> MS. JACKSON: Your Honor, during the brief recess, Boyne and United Growers have agreed and acknowledged that the no shop that is in the asset purchase agreement is not enforceable, and they have agreed to release any claim against the estate in connection with the asset purchase agreement, except a possible claim for substantial contribution against the estate and have also agreed to waive any possible claim against the estate's professionals, including the investment bankers.
>
> They have also agreed to allow the debtor to amend the motion to seek a different stalking horse bidder . . . . So with that, we do wish to amend our sale motion to seek approval of Insight or BFN Foliage, as it's identified in their asset purchase agreement, as the stalking horse bidder, with all of the same provisions that we identified in our motion, but with modifications that have been identified on the record and we will revise that order to adjust to everything that's been announced today, and circulate it amongst all of the various parties before we submit it to your Honor.
>
> But, your Honor, I do feel that I would be remiss if I did not acknowledge Boyne and United Growers for the contribution that they have made to this case, and for the way that they have worked with us. We acknowledge that they've incurred substantial legal fees, that they used intellectual property and financial resources and that they brought us here today. They really set the platform with their agreement, and that will be the agreement from which all of the other bidders submit bids. So we do thank them for their participation in the process, as challenging as that process may be.

MIAMI 900402 v2 (2K)

Hearing Tr. 54:25-56:19.[1]

13.     Additionally, the Court advised United's counsel to file the present Application if United wished to seek a substantial contribution claim:  "Mr. McGill, I want to thank you and your client for all the efforts that they've made, and to the extent you choose to make a substantial contribution motion, as I said, I will consider that at the time that it's filed." Hearing Tr. 61:21-61:25.

14.     On January 14, 2011, the Court entered its Order (A) Authorizing and Approving Bidding Procedures for the Sale of Substantially all the Debtor's Assets, Free and Clear of all Liens, Claims, and Encumbrances; (B) Approving Form of Purchase Agreement, Including a Combined Break Up Fee and Expense Reimbursement; (C) Scheduling an Auction and Final Hearing to Consider Approval of the Sale, including the Assumption and Assignment of Executory Contracts and Unexpired Leases; (D) Approving Form and Manner of Notice of Bidding Procedures, Auction and Sale Hearing [C.P. # 224] (the "Bid Procedures Order").  The Bid Procedures Order authorized the Competing Bidder to serve as the stalking horse purchaser and scheduled an auction and a hearing to approve the sale of the Assets for February 7, 2011.

## JURISDICTION

15.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).

---

[1]    A copy of the transcript of the Hearing is attached hereto as Exhibit "B".

MIAMI 900402 v2 (2K)

**RELIEF REQUESTED**

16. Pursuant to section 503(b) of the Bankruptcy Code, United seeks allowance of the Administrative Claim, and requests that such claim be paid immediately out of the proceeds of the sale of the Assets, whether pursuant to the Competing Agreement or some higher and better offer approved by the Court.

**BASIS FOR RELIEF**

17. Under section 503(b)(3)(D) of the Bankruptcy Code, a creditor "shall" recover as administrative expenses the actual, necessary expenses incurred in making a substantial contribution in a case under chapter 11.  11 U.S.C. § 503(b)(3)(D); see Hall Fin. Group, Inc., v. DP Partners, Ltd., P'ship (In re DP Partners, Ltd., P'ship), 106 F.3d 667, 671 (5th Cir. 1997) ("This statutory mandate permits of [sic] no discretionary calls by the court").  Further, section 503(b)(4) provides for reasonable compensation for professional services rendered by an attorney or accountant to such a creditor.  11 U.S.C. § 503(b)(4).

18. Although the term "substantial contribution" is not expressly defined in the Bankruptcy Code, courts have held that a substantial contribution is one that "foster[s] and enhance[s], rather than retard[s] or interrupt[s] the progress of reorganization."  In re Celotex Corp., 227 F.3d 1336, 1338 (11th Cir. 2000) (citing In re Consolidated Bancshares, Inc., 785 F.2d 1249, 1253 (5th Cir. 1986)).  Further, the United States Court of Appeals for the Eleventh Circuit has concluded that "a creditor's motive in taking actions that benefit the estate has little relevance in the determination whether the creditor has . . . ma[de] a substantial contribution to a case."  Id. at 1339 (quoting In re DP Partners, Ltd., 106 F.3d 667, 673 (5th Cir. 1997)); see also In re Kidron, Inc., 278 B.R. 626, 633 (Bankr. M.D. Fla. 2002) (holding that unsuccessful bidder had made a substantial contribution to the debtor's estate, and would be allowed an

7

administrative expense claim for legal expenses incurred in facilitating the flow of due diligence information).

19. Courts recognize that an important policy embodied by section 503(b) of the Bankruptcy Code is to promote participation among interested parties in a chapter 11 proceeding. See, e.g., In re 9085 E. Mineral Office Bldg. Ltd., 119 B.R. 246, 253 (Bankr. D. Col. 1990) (warning that if certain creditors are subject to too strict standards with respect to substantial contribution the result would have an unfortunate chilling effect upon the goal of section 503(b)(3)(D) which is to encourage meaningful creditor participation). One means of achieving this policy is "by offering to reimburse those creditors who make substantial contributions." In re Western Asbestos Co., 318 B.R. 527, 531 (Bankr. N.D. Cal. 2004). Similarly, courts recognize that break up fees and expense reimbursements are critical to inducing a potential purchaser to act as a stalking horse bidder, and to compensate such bidder for the time, money and effort spent negotiating with the debtor despite the risks and uncertainties of the chapter 11 bankruptcy process. See, e.g., In re Dorado Marine, Inc., 332 B.R. 637, 639 (Bankr. M.D. Fla. 2005) ("The [break up] fee is intended to compensate the bidder for the time, effort, and risk of being the stalking horse, and to encourage the bidder to do the necessary due diligence with the assurance that its efforts will be compensated if it is unsuccessful.") (citing Calpine Corp. v. O'Brien Env't. Energy, Inc. (In re O'Brien Env't. Energy, Inc.), 181 F.3d 527, 535 (3d Cir. 1999)).

20. Here, and as more fully described in the declaration of Charles Hanemann attached hereto as Exhibit "A", United spent a significant amount of time, money and effort on conducting diligence, retaining professional services, and negotiating the terms of a stalking horse agreement with the Debtor, with the reasonable expectation that it would be entitled to

8

some form of bidder protection in connection with the Debtor's proposed auction process. Nevertheless, at the Hearing on the Debtor's motion to approve such bidder protections, the Creditors' Committee revealed the existence of the Competing Agreement, which was approved by the Court instead of the Stalking Horse Agreement, along with bidder protections in favor of the Competing Bidder in lieu of United.

21. The Competing Agreement was undoubtedly made possible through the efforts of United. The Competing Bidder was included in the marketing process, yet initially elected not to serve as a stalking horse bidder. Instead, after United committed significant time and resources to diligence and to the negotiation and drafting of the Stalking Horse Agreement, the Competing Bidder simply copied the Stalking Horse Agreement and modified a handful of terms.

22. In short, although not ultimately approved as the stalking horse bidder, United has already accomplished the intended purpose of such role – the Stalking Horse Agreement provided the form of sale agreement and locked in a "floor" purchase price before exposing the Assets to auction, upon which all other interested purchasers can submit, or in the case of the Competing Bidder, have already submitted, competing bids for the purchase of the Assets. As stated by the Debtor's counsel on the record of the Hearing:

> MS. JACKSON: But, your Honor, I do feel that I would be remiss if I did not acknowledge Boyne and United Growers for the contribution that they have made to this case, and for the way that they have worked with us. We acknowledge that they've incurred substantial legal fees, that they used intellectual property and financial resources and that they brought us here today. <u>They really set the platform with their agreement, and that will be the agreement from which all of the other bidders submit bids.</u>

Hearing Tr. 56:5-56:15 (emphasis added).

9

MIAMI 900402 v2 (2K)

23. To allow the Debtor's estate to realize the benefits of United's efforts in fostering the sale process in this chapter 11 case, without at least reimbursing United's expenses in connection therewith, would be manifestly unjust and would only serve to deter future creditors from tackling such difficult chapter 11 situations and from facilitating the maximization of a debtor's assets. Accordingly, allowance of the Administrative Claim will clearly further the purpose of and should be approved pursuant to section 503(b) of the Bankruptcy Code.

WHEREFORE, United respectfully requests entry of an Order, substantially in the form attached hereto as Exhibit "C", (i) allowing the Administrative Claim, (ii) directing that such claim be paid immediately out of the proceeds of the sale of the Assets, and (iii) granting such further relief as the Court deems just and proper.

Dated: January 21, 2011
       Miami, Florida

*I hereby certify that I am admitted to the Bar of the United States District Court for the Southern District of Florida and I am in compliance with the additional qualifications to practice in this court set forth in Local Rule 2090-1(A).*

        WHITE & CASE LLP
        Wachovia Financial Center
        Suite 4900
        200 South Biscayne Boulevard
        Miami, Florida 33131-2352
        Telephone: (305) 371-2700
        Facsimile: (305) 358-5744
        E-mail: lroesch@whitecase.com

        By:    /s/ *Lane E. Roesch*
            Lane E. Roesch, Esq.
            Florida Bar No. 016364

MIAMI 900402 v2 (2K)

    *I hereby certify that the undersigned attorney is appearing pro hac vice in this matter pursuant to court order dated January 14, 2011.*

                                               Kevin M. McGill, Esq. (*admitted pro hac vice*)
                                               WHITE & CASE LLP
                                               Wachovia Financial Center
                                               Suite 4900
                                               200 South Biscayne Boulevard
                                               Miami, Florida 33131-2352
                                               Telephone: (305) 371-2700
                                               Facsimile: (305) 358-5744
                                               E-mail: kmcgill@whitecase.com

                                               *Counsel for United Growers, LLC*