# EXHIBIT "B"

1                    UNITED STATES BANKRUPTCY COURT

                    SOUTHERN DISTRICT OF FLORIDA

2

                    Judge Laurel Myerson Isicoff

3

4  IN RE:

                        )

5  FIRST FOLIAGE, L.C.,    ) CASE NO: 10-27532-BKC-LMI

        Debtor.        )

6  _____ )

7

8       EMERGENCY MOTION TO APPROVE - EMERGENCY MOTION

       FOR ENTRY OF (I) AN ORDER (A) AUTHORIZING

9      AND APPROVING BIDDING PROCEDURES FOR THE

       SALE OF SUBSTANTIALLY ALL THE DEBTORS ASSETS,

10                 ET AL (204)

11

                  JANUARY 13, 2011

12

13

14       The above-entitled cause came on for hearing

15  before the HONORABLE LAUREL M. ISICOFF, one of the

16  judges in the UNITED STATES BANKRUPTCY COURT, in and

17  for the SOUTHERN DISTRICT OF FLORIDA AT LARGE, at 51

18  SW 1st Avenue, Miami, Dade County, Florida, commencing

19  at or about 9:00 a.m., on January 13th, 2011, and the

20  following proceedings were had:

21

22

23

24              Reported by: Carmen E. De La Cruz

25

Page 2

```
 1              APPEARANCES:
 2      INFANTE ZUMPANO HUDSON & MILOCH, by
        LUIS SALAZAR, Esquire
 3      LINDA JACKSON, Esquire
        On behalf of the Debtor, First Foliage.
 4
 5      BERGER SINGERMAN, by
        JORDI GUSO, Esquire
 6      DEBI EVANS GALLER, Attorney-At-Law
        On behalf of the Official Committee of
 7      Unsecured Creditors.
 8
        WHITE & CASE, by
 9      KEVIN MCGILL, Esquire
        On behalf of United Growers.
10
11      K & L GATES, LLP, by
        JEFFREY T. KUCERA, Esquire
12      On behalf of Rural Community Insurance
        Services.
13
14      HUNTON & WILLIAMS, by
        ANDY ZARON, Esquire
15      and
        KATTEN MUNCHIN ROSENMAN, LLP, by
16      JOHN P. SIEGER, Esquire
        on behalf of Bank of America.
17
18      HUNTON & WILLIAMS, by
        ANDREW JILLSON, Esquire
19      JARRETTE HALE, Esquire
        On behalf of Insight Equity and Berry Family
20      of Nurseries.
21
        OFFICE OF THE UNITED STATES TRUSTEE, by
22      ARIEL RODRIGUEZ, Trustee
23
                   I N D E X
24
            COMMITTE'S EXHIBIT NUMBER 1   PAGE 58
25
```

OUELLETTE & MAULDIN COURT REPORTERS, INC.
(305) 358-8875

1           THE COURT:  Good morning.  Please be

2    seated.  I guess we have to take appearances, but

3    let's do it quickly since the clock is running.

4           MR. SALAZAR:  Good morning, Your Honor.

5    Luis Salazar of Infante Zumpano Hudson & Miloch, with

6    me is my colleague, Linda Jackson and Celly Aguilar.

7           Your Honor, this here in the front row is

8    the first Foliage management team, which I have

9    introduced you to before, so, if you'll excuse me and

10   they'll excuse me, I mean, considering the time, I'll

11   skip the personal appearances.

12          THE COURT:  Okay.  Good morning, everyone.

13          MR. GUSO:  Good morning, Your Honor.

14   Jordi Guso and Debi Galler from Berger Singerman on

15   behalf of the official committee of unsecured

16   creditors.

17          THE COURT:  All right.  Good morning.

18          MR. ZARON:  Good morning, Your Honor.

19   Andy Zaron of Hunton & Williams.  We're local counsel

20   for Bank of America.  With me in court is the lead

21   counsel for the bank, John Sieger --

22          THE COURT:  Uh-huh.

23          MR. ZARON:  -- of the Katten Munchin Firm.

24   Although we are not committee professionals -- estate

25   professionals, Your Honor, in the interest of

Page 4

```
 1    disclosure, I do want to disclose that our firm was
 2    retained recently in the past few days to represent a
 3    potential buyer on the deal, Insight Equity.
 4              We've spoken to counsel for the debtor and
 5    the committee who have agreed to the concurrent
 6    representation provided that we erect an ethical wall
 7    which we've agreed to do and Bank of America and
 8    Insight have also agreed to the concurrent
 9    representation provided that we erect the ethical wall
10    and in the event of an actual conflict, we would
11    withdraw from the representation of Insight Equity.
12              THE COURT:  Okay.  Thank you.
13              MR. RODRIGUEZ:  Good morning, Your Honor.
14    Ariel Rodriguez on behalf of the United States
15    Trustee.
16              THE COURT:  Okay.  Good morning.  Anyone
17    else wish to make their appearance?
18              MR. MCGILL:  Good morning, Your Honor.
19    Kevin McGill with White & Case on behalf of United
20    Growers, LLC.  I'm joined by my colleague David Burke,
21    George Freeland, and also there's a representative of
22    United, Charles Hanaman is in the court today.
23              THE COURT:  Okay.  Thank you.
24              MR. MCGILL:  Thank you.
25              MR. KUCERA:  Good morning, Your Honor.
```

Page 5

1   Jeffrey Kucera from K & L Gates on behalf of Rural

2   Community Insurance Services.

3          MR. JILLSON:  Good morning, Your Honor.

4   My name is Andrew Jillson I'm here with my colleague,

5   Jarrette Hale, we are of the firm of Hunton & Williams

6   and we represent Insight Equity and Berry Family

7   Nurseries and also with me today is Conner Searcy and

8   Barel Barry, clients.

9          THE COURT:  All right.  Thank you very

10  much.  Anyone else wish to make an appearance.

11         All right.  Who am I going hear from,

12  Ms. Jackson.

13         MS. JACKSON:  Yes.

14         THE COURT:  All right.

15         MS. JACKSON:  Good morning, Judge.  Thank

16  for indulging us in the time we needed before we came

17  in.  I am pleased to announce that we are here on our

18  road to the exit door after just five months --

19         THE COURT:  Okay.

20         MS. JACKSON:  -- in Chapter 11.  We were

21  able to find a buyer for the company, agree on terms

22  with that buyer and propose a sale to the Court.  We

23  expect to exit the Chapter 11 less than a year from

24  the filing date.

25         We hired Bayshore Partners, as you know,

Page 6

1    in September 2010 as investment bankers to seek an

2    interested party who would bring financing equity or

3    sale of the company.  The debtor actually was open to

4    all possibilities.  Bayshore sent out over 200 letters

5    with information about the company to prospective

6    interested parties, and from their efforts we received

7    letters of interest from various parties who were all

8    told to make their offer by a certain date. We

9    proposed to have a structured auction process to

10   enable us to have -- to obtain the best possible

11   price.

12           In consultation with Bayshore and Bank of

13   America, we chose the highest and best offer which was

14   Boyne Capital, and we began to negotiate the terms of

15   an asset purchase deal with Boyne Capital.

16           The motion that we filed, Docket Entry

17   204, seeks approval of a sale of virtually all of the

18   debtor's assets to United Growers, LLC, which is an

19   affiliate of Boyne, for a cash purchase price at

20   closing of $13.5 million in cash with certain

21   adjustments identified in the agreement for a total

22   compensation of, approximately, $14 million.

23           The assets will be sold free and clear of

24   all liens, claims and encumbrances with all liens,

25   claims and encumbrances to attach to the proceeds of

Page 7

1    the sale.  The purchaser intends to hire all of the

2    employees of the company, assume all of the executory

3    contracts and leases used in the ordinary course of

4    the business and to continue operating the business,

5    all subject to the terms of the asset purchase

6    agreement.

7                We will be filing a separate motion to

8    assume and assign the executory contracts and leases

9    and hope that that could be heard at the sale hearing

10   in conjunction with approval of the sale and then

11   become effective on the closing date.

12                THE COURT:  Okay.

13                MS. JACKSON:  The purchaser will pay,

14   virtually, all of the cure costs.  The buyer will also

15   assume certain specified liabilities of the company

16   and closing will occur within two days after the sale

17   order becomes a final order or sooner, all subject to

18   the conditions in the agreement.

19                We are here today solely to consider the

20   bid procedures identified in the motion.  The bid

21   procedures are identified in the motion and I can

22   summarize them for the Court.

23                THE COURT:  Well, why don't you summarize

24   them as modified by the agreements that have been

25   resolved, rather than repeating what is no longer

1    relevant because we do not have a lot of time.  If

2    nothing has been resolved, then we can take it from

3    there.  Okay.

4              MS. JACKSON:  Your Honor, the main

5    objections that we received with respect to the bid

6    procedures revolved around the break-up fee.  The

7    break-up fee that's called for in the agreement is

8    $500,000 --

9              THE COURT:  Uh-huh.

10             MS. JACKSON:  -- which is reimbursement of

11   costs and expenses or, and this was one of the

12   modifications, actual expenses up to $500,000.

13   Either --

14             THE COURT:  Just so that I understand, so

15   that the modification of the break-up fee is that it

16   will only be for reimbursement of actual costs and

17   expenses subject to a $500,000 cap; is that correct?

18             MS. JACKSON:  It's different under two

19   different circumstances.  If we close with an

20   alternative buyer, then it would be the $500,000 and

21   under the other circumstances identified in the

22   agreement, it would be actual expenses up to $500,000.

23             THE COURT:  So, in other words, the

24   stalking horse would get the break-up fee even if

25   there's no closing?

1          MS. JACKSON:  That's correct, Your Honor.

2          THE COURT:  And this has been agreed to by

3    everybody?

4          MS. JACKSON:  No.  It has not, Your Honor.

5    It's been agreed to by the debtor and it is in the

6    asset purchase agreement.  It is still the subject of

7    objections.

8          THE COURT:  Okay.

9          MS. JACKSON:  The objections to the

10   break-up fee have been based both on the

11   reasonableness of the amount and the conditions upon

12   which it is paid.

13         I'll address the dollar amount first.

14   Your Honor, the break-up fee of $500,000 equals

15   approximately 3.5 percent of the total purchase price

16   which we believe is reasonable.

17         THE COURT:  Okay.  I'm going to stop you

18   and I'll just say that I have repeatedly ruled without

19   exception since the day I came on the Bench, that I

20   will not approve a break-up fee that is not tied to

21   actual costs and expenses of the stalking horse.

22         So I have repeatedly ruled that.  I have

23   never wavered.  So, what you can do, if you want, is

24   to try to convince me why I'm wrong, but I just, in

25   the full interest of disclosure, I have already ruled

1    on this issue many times.

2              MS. JACKSON:  Okay.  Your Honor, in this

3    respect, the purchaser has advised us that he expects

4    to actually spend upwards of $600,000 and has outlined

5    the anticipated costs for us which I can identify for

6    Your Honor.

7              THE COURT:  Well, I don't think I need to.

8    If the understanding is that there is a cap and that

9    it is tied to actual expenses, if the parties actually

10   expend up to 600 or up to $500,000, then we don't have

11   to have the academic discussion about how it's

12   treated, right?  And the way I've handled this in the

13   past is that if the break-up fee actually becomes

14   implicated, I ask that after the sale, that the

15   stalking horse circulate the actual expenses to all

16   the parties in interest.  If there's no objection,

17   then the break-up fee is paid and if there is an

18   objection, then I have the hearing.  And that's been

19   handled in every sale we've had.

20             I see that you rise.  Purchaser's attorney

21   rises to speak.  Mr. McGill.

22             MS. JACKSON:  Okay.  Your Honor, I've just

23   been advised that the purchaser will agree to that,

24   so, that it would be actual costs up to $500,000.

25             THE COURT:  Okay.  So then it sounds like

1    the other issue is the condition.

2              MS. JACKSON:  Yes, Your Honor.

3              THE COURT:  All right.  And what is the

4    criteria or what is the justification for paying a

5    break-up fee if there's no closing?

6              MS. JACKSON:  Your Honor, the

7    justification for paying the break-up fee is that this

8    particular purchaser, being the stalking horse, has

9    incurred expenses that none of the other bidders will

10   incur because they expended the funds to pay for the

11   development of the asset purchase agreement, all of

12   the closing documents, assistance with the motion and

13   the orders --

14             THE COURT:  Uh-huh.

15             MS. JACKSON:  -- which none of the other

16   purchasers will need to incur because it has already

17   been done.

18             THE COURT:  Uh-huh.

19             MS. JACKSON:  They are also the ones that

20   came to the table, were willing to commit and will, we

21   expect, attract others at the auction which is really

22   the purpose of the stalking horse.

23             We've been contacted by others.  We

24   believe there will be other people at the action.  We

25   believe that this purchaser has been instrumental in

1    bringing other people to the table and that they will

2    bring the purchase price up by virtue of committing to

3    an agreement.

4              THE COURT:  Okay.  But then you've just

5    said the key words there and that was the basis of the

6    objection of some of other parties, committing to the

7    agreement.

8              As the agreement stood, at least before I

9    walked in here, the purchaser did not have to go hard,

10   okay, and that, notwithstanding that, the break-up fee

11   was an entitlement.   So has that been resolved?

12             MS. JACKSON: Yes, Your Honor.

13             THE COURT:  Okay.  So now the break-up fee

14   is only implicated if the stalking horse is ready,

15   willing and able to close, is not the successful

16   bidder and the alternative bidder does not close, they

17   nonetheless get the break-up fee, is that correct?

18             MS. JACKSON:  Yes.

19             THE COURT:  Okay.  But not if United

20   Grower walks.

21             MS. JACKSON:  I see shakes.

22             THE COURT:  Why don't you take a moment to

23   speak to Mr. McGill.

24             MS. JACKSON:  Yes, Your Honor.

25             THE COURT:  Okay.  And while they're

1  chatting, just for the rest of you, I just looked at

2  Judge Cristol's calendar and he does not start until

3  3:00.  So if you all have to come back at 1:30, I

4  could see you from 1:30 to 3:00.  Okay?

5          MR. SALAZAR:  Thank you, Judge.

6          THE COURT:  Wait a minute.

7          MR. SIEGER:  Your Honor, in the interest

8  of what I understand is a very busy schedule, I think

9  there's, you know, a 900 pound gorilla in the room

10 that you're not aware of yet that Mr. Guso is going to

11 speak to.  And I just asked Ms. Jackson if I could

12 step up.

13          I'm John Sieger appearing pro hoc vice on

14 behalf of the bank.  Thank you for allowing me to

15 appear here today, Judge.

16          THE COURT:  Not a problem.

17          MR. SIEGER:  I'll abbreviate briefly what

18 I was going to say.

19          THE COURT:  Yes.

20          MR. SIEGER:  We're the senior secured

21 creditor.  It turns out now that it seems based on the

22 value of the business that we are underwater.  We

23 probably have a 507 claim.  Strictly speaking, I think

24 we're the only party in interest that's in the money.

25          THE COURT:  Uh-huh.

1           MR. SIEGER:  Our objection to the stalking

2   horse bid has not been resolved.  There's been some

3   tweaking around the edges, but sort of the big issue

4   this morning was that Mr. Guso has generated what we

5   believe to be a more attractive better stalking horse

6   bid.

7           Frankly, while I haven't had an

8   opportunity to read the documents yet, given that we

9   have less ten minutes left, I would much prefer that

10  he get an opportunity to present a bid that I think

11  the parties in interest, the creditors and the money

12  support rather than talking about the fine points of a

13  bid that I'm pretty sure nobody else supports.

14          That's my suggestion to the Court and I

15  won't go on and argue all the many points in our

16  objection, suffice it to say that don't -- we're not

17  in favor of that bid, and if we had to have an oral

18  argument about it, I believe we could successfully

19  defeat the motion on the basis that we raised.

20          THE COURT:  Okay.  Let me give Ms. Jackson

21  a moment to finish speaking with Mr. McGill since in

22  fairness to them, they ought to be able to listen to

23  what you're saying.

24          All right.  Ms. Jackson, while you were

25  chatting with Mr. McGill the bank has advised me that

1    there's a much bigger issue and that is that there is

2    no constituent support other than the debtor for the

3    proposal that you make.

4           So, perhaps before we break and I also did

5    state in case you didn't hear and, Mr. McGill, if you

6    weren't able to hear, that I checked Judge Cristol's

7    schedule and I do have the courtroom from 1:30 to

8    3:00.

9           So that you can complete your thought,

10   I'll let you tell me what your conversation with

11   Mr. McGill alleged, but then perhaps we can use the

12   rest of the time to talk about whether there's a point

13   in pursuing the fine points of something that may be a

14   fruitless act.  So, I'm not saying it is, it just

15   seems to be that would be short-cutting where we seem

16   to be now.

17          So just quickly tell me what you and

18   Mr. McGill discussed.

19          MS. JACKSON:  Your Honor, they have

20   confirmed that the break-up fee would only be payable

21   after the deposit has gone hard.

22          THE COURT:  Okay.

23          MS. JACKSON:  After it's firm.

24          THE COURT:  Okay.  All right.  So that

25   brings closure to that issue for lack of a better

1    word.

2              All right.  So, as I said, Mr. Sieger said

3    -- suggested that the bank is not in support of this

4    motion, to this bid, at all, all right, and that the

5    committee has another bid.

6              My view of the world is that we're here

7    today on your bid procedure motion, but having said

8    that, it seems to me that while everybody is here,

9    that this is a conversation that has not been

10   completed yet.

11             MS. JACKSON:  I would say that's correct,

12   Your Honor.

13             THE COURT:  Okay.  So, while we can sit

14   and chat for another ten minutes, let's say, about

15   this issue, my question to you all is, is this time

16   better served by allowing you all to go back in the

17   hallway or down to La Loggia or Granny's or whereever

18   it is you people go, and coming back at 1:30 and

19   seeing if we get any further -- or at that time, then

20   what I'd do is I need to hear argument as to why it is

21   appropriate for me to, one, continue with this hearing

22   or, two, hear what the committee has to say, is this

23   the appropriate forum to do that.  So, Ms. Jackson or

24   Mr. Sieger, did you want to say something?

25             MR. SIEGER:  Just talk, to confer with

Page 17

1  her.

2          THE COURT:  Okay.  Sure.

3          MS. JACKSON:  Your Honor, I do think it

4  would be helpful to give the parties more time to

5  talk.  Nobody wants to delay the auction and the sale

6  hearings.  We have certain financial constraints and

7  also deadline constraints, they're in the cash

8  collateral order.

9          So, we are going to need certain dates in

10 order to comply with those things.  Mr. Sieger has

11 just asked me to confirm that we will be able to

12 arrange for those dates to make sure that we meet

13 those deadlines.

14         THE COURT:  Uh-huh.

15         MS. JACKSON:  So we would like to address

16 that but, in addition, Your Honor, just to address

17 your question about whether it's fruitful to continue

18 with this motion, we believe it is --

19         THE COURT:  Uh-huh.

20         MS. JACKSON:  -- because notwithstanding

21 the objections, I think everybody in this room agrees

22 that we would like this sale process to continue and

23 for the motion to be granted in some form.

24         THE COURT:  Uh-huh.

25         MS. JACKSON:  Mr. Guso has presented today

1   another offer that he would like to advance and none

2   of the parties here have seen that prior to this

3   morning.

4          THE COURT:  Uh-huh.

5          MS. JACKSON:  So we have not had an

6   opportunity to digest it.  Nevertheless, the debtor is

7   supporting the Boyne sale.  We're committed to that in

8   the agreement and we believe that that is a good sale.

9          THE COURT:  Okay.  So, what it seems to me

10  is because that -- can everybody come back at 1:30?

11         MR. SIEGER:  If I could, I'm sorry to

12  interrupt, but more specifically to my point to

13  Ms. Jackson, it would be helpful from my perspective

14  if we could know, based on your availability, Judge,

15  in early part of February, when we could have a

16  hearing on approval of the auction before we take our

17  break.

18         THE COURT:  No, no, we'll do that.  I

19  just, I'm trying to do it in series.  Okay.  Starting

20  with the immediate future.  Okay.  So, immediate

21  future is everybody can be back at 1:30.  Okay.  So

22  1:30 and then at 2:25 everybody has to leave so that

23  Judge Cristol can have his hearing.  Just remember to

24  write to your congressmen when they try to reduce the

25  amount of Bankruptcy Court sizes.  Okay.

1           The second thing is that it appears to me

2     that Ms. Jackson is correct.  I mean, what we have

3     right here now is the debtor's motion to approve.

4           If, Mr. Guso, your proposal is one that

5     the debtor is not willing to put forth, then you'll

6     have to explain to me procedurally why and then, to

7     the extent it is appropriate to be considering that

8     today rather than at a separate process, or as part of

9     the competing bid process that I would approve it if I

10    do approve it today.

11          MR. GUSO:  Thank you, Your Honor.  We

12    would be doing that.

13          THE COURT:  Okay.  All right.  So let's

14    talk about timing then.  Understanding that anything

15    that I say is subject to Ms. Sanabria's approval.

16    Everybody knows that, right?  Okay.

17          All right.  So, what are the dates that

18    you're interested in?

19          MS. JACKSON:  Your Honor, we would be

20    interested in February 3rd to have an auction, perhaps

21    in the morning and a hearing in the afternoon so that

22    it could all be the same day.

23          THE COURT:  Okay.  February 3rd I will be

24    Cayman.  If you all want to come to Cayman with me, I

25    will be more than happy to have the hearing on that

Page 20

1   day.

2                     MR. SALAZAR:  I'll be there, Judge.  I can

3   handle it.

4                     THE COURT:  Right.  There you go.  Okay.

5   So all of you sign up for the ABI Caribbean Conference

6   and we can have the hearing in the afternoon.

7   Otherwise, it would either have to be the day before

8   or it would have to be Monday, and let me check my

9   Monday calendar.  Okay.  I'm thinking everybody's

10  thinking Cayman is looking really good right now.

11                    MS. JACKSON:  Yes, it sounds really good

12  right now.

13                    THE COURT:  Okay.  Monday's pretty tight,

14  but if need be, we'll just -- oh, my God.  Okay.  We

15  could -- I could do Monday at 3:45.  I have a hearing

16  at 3:30 that shouldn't take more than about 15

17  minutes.

18                    MS. JACKSON:  And is the 2nd an option

19  just so that we know?

20                    THE COURT:  Let me just check.  The

21  problem is Mondays and Wednesdays are my standard

22  hearing calendar.  So I usually have about 50 or 60

23  matters set.  I have an evidentiary hearing at 2:15 on

24  Wednesday the 2nd, but that shouldn't take more than

25  an hour.  So let's say 3:00.  I could do three o'clock

1    on the 2nd.

2              MS. JACKSON:  Your Honor, if we could, we

3    can make that part of the discussion between now and

4    1:30, if you don't mind.

5              THE COURT:  No, no, that's fine.  Okay.

6    And what would be the other dates that you would want?

7              MS. JACKSON:  I think those are the only

8    two.

9              THE COURT:  That's the only one.  Okay.

10             MR. SALAZAR:  Yes.

11             THE COURT:  All right.  Then is there

12   anything you all want to do, I think we can squeeze

13   another five minutes in before we leave.  Otherwise,

14   I'll see you all at 1:30.  Yes?

15             MS. JACKSON:  This is probably a good

16   breaking time.

17             THE COURT:  Okay.  Then I'll see you all

18   at 1:30.  Thank you for your patience with our

19   courtroom situation.

20             MS. JACKSON:  Thank you.

21

22

23

24

25

1          (Thereupon, a recess was taken in the

2     proceedings until 1:30, during which there was a

3     change in court reporters from Carmen de la Cruz

4     to Margaret Franzen, after which the following

5     proceedings were had:)

6          THE COURT:  All right.  I took appearances

7     this morning.  Is there anybody new or additional

8     that would like to make an appearance that was not

9     here this morning?  No, then let's proceed.

10          Ms. Jackson.

11          MS. JACKSON:  Judge, I'm going to be

12     brief, I know you have limited time and there are

13     other parties who want to speak, as well.  I

14     would just reiterate that we're on -- we're here

15     on a motion to approve bid procedures and that

16     that's all we're here for today.

17          Based on certain conditions with the

18     bank in the cash collateral order and also the

19     financial situation of the debtor, we need to

20     have bid procedures approved today and to have an

21     auction set.

22          The debtor is essentially running out

23     of cash and the debtor needs to close a deal by

24     mid -- by about mid February, possibly the third

25     week in February.  So we're working on a very

Page 23

```
 1    tight time frame and we can't afford to continue

 2    this hearing or to wait for another motion to be

 3    filed.

 4              We understand that Mr. Guso has

 5    presented a new bidder today.  However, that

 6    bidder did not submit any letter of interest to

 7    the debtor at any time.  Notwithstanding notice

 8    from the investment bankers over three months

 9    ago, today was the first time we had heard of it.

10              We did have an opportunity to review

11    it.  We are familiar with it.  We've noted the

12    differences, which I believe Mr. Guso is going to

13    highlight for you, but we are committed to the

14    agreement that was presented to your Honor.  It

15    is a deal that we negotiated and that we are

16    adhering to, but we would ask your Honor in the

17    event that your Honor does not want to approve

18    that bidder as the stalking horse, that you do

19    approve a stalking horse today and you do approve

20    the bidding procedures --

21              THE COURT:  Okay.

22              MS. JACKSON:  -- that have been presented.

23    We provided you with a copy of an amendment to the

24    asset purchase agreement by Boyne, which we received

25    late last night, and which has been provided to
```

1    counsel for the committee and Bank of America, and

2    that is the amended asset purchase agreement that

3    we're presenting before your Honor, again as amended

4    as stated in court this morning.

5            THE COURT:  Although there were some

6    changes in this first amendment that do not reflect

7    the conversations we had this morning.

8            MS. JACKSON:  That's correct, and the

9    conversations that we had this morning will be the

10   ones that are in the agreement.  This was an

11   amendment that was prepared last night.

12           THE COURT:  I understand.  Well, I'm glad

13   you clarified that for me because I did review this

14   briefly after my judges' meeting, and was a little

15   confused because it still had things in there that I

16   thought we had addressed.

17           MS. JACKSON:  That was in an effort for the

18   purchaser to address some of the objections that had

19   been filed by Bank of America and the committee.

20           THE COURT:  Okay.  What I'm going to ask

21   you to do before I hear from Mr. Guso, Mr. Sieger or

22   anybody else that would like to address the Court,

23   and Mr. Rodriguez, we've gone over the bidding

24   procedures issue.

25           Now, there were some other issues that

Page 25

```
 1   were raised by the bank with respect to 363, and
 2   I'm going to assume that your position is that
 3   you don't need to address those today; is that
 4   correct?
 5            MS. JACKSON:  There were two issues that we
 6   do need to address today, and I believe we are in
 7   agreement with the bank on those two issues.  One is
 8   that the bank has requested that they be deemed a
 9   qualified bidder at the auction, but that they be a
10   qualified bidder for the stalking horse bid, and that
11   they will not increase their bid.
12            In other words, they would only be the
13   successful purchaser in the event that the
14   stalking horse did not follow through and that
15   there were no other bidders.
16            THE COURT:  Okay.
17            MS. JACKSON:  They will not participate in
18   the auction, per se.
19            THE COURT:  Okay, and then the second
20   point?
21            MS. JACKSON:  The second point was that
22   they wanted a back -- they wanted a backup bidder to
23   be chosen at the auction and to permit the debtor to
24   prepare documentation with that backup bidder so that
25   in the event the winning bidder did not close, we
```

1   could immediately go to closing with that backup

2   bidder.  That portion of it we have agreed to.

3           They also requested that ---

4           THE COURT:  Does that mean you did not

5   agree to the first point?

6           MS. JACKSON:  The first point ---

7           THE COURT:  The stalking horse bidder

8   point?

9           MS. JACKSON:  That the purchaser did not

10  agree to.  The bank wanted the purchaser to be

11  committed to be a backup bidder in the event ---

12          THE COURT:  Okay.  I'm sorry.  You

13  referenced a first point and maybe I missed it.  I

14  just want to make sure.  With respect to the first

15  point that you addressed with me, that B of A be a

16  qualified bidder for the stalking horse bid, you are

17  in agreement on that?

18          MS. JACKSON:  For the auction, yes.

19          THE COURT:  Okay.  So now we get to the

20  backup bidder chosen at the auction.  You're saying

21  you're in agreement with their being ready -- ready

22  to close with the backup bidder, but not in agreement

23  with what?

24          MS. JACKSON:  The bank also requested that

25  the purchaser, Boyne, serve as a backup bidder in the

Page 27

1    event that they were not the winning bid, and Boyne

2    did not agree to that, so they are not bound to be a

3    backup bidder.

4              THE COURT:  Okay.  So what Boyne is saying

5    is that -- or United Growers, is that if they want to

6    be the backup bidder, that should be their choice,

7    but they shouldn't have to be obligated.

8              MS. JACKSON:  Exactly.

9              THE COURT:  What else?  Anything else on

10   Bank of America that you would like to tell me before

11   I hear on the points that the U.S. Trustee raised?

12             MS. JACKSON:  The bank had also requested

13   that they be paid out of the proceeds of sale at

14   closing, and we have not agreed to that.  We believe

15   that they should be paid pursuant to a plan and that

16   their lien will attach to the proceeds of a -- of a

17   sale.

18             THE COURT:  Okay.

19             MS. JACKSON:  And I believe those were all

20   the points that pertained to bid procedures, as

21   opposed to sale points --

22             THE COURT:  Okay.

23             MS. JACKSON:  -- that were identified in

24   their objection.

25             THE COURT:  Okay.  All right.  Now, let's

1    go the U.S. Trustee's issues, have you resolved

2    anything with them?

3            MS. JACKSON:  The U.S. Trustee's issues, I

4    believe, all go to the amount of the break-up fee and

5    the conditions upon which they will be paid.

6            THE COURT:  Okay.

7            MS. JACKSON:  We have not resolved those,

8    other than in terms of what we identified this

9    morning, that the break-up fee remains as described

10   and that it's only payable once the deposit goes

11   hard.  We have not had the opportunity to discuss

12   that with the U.S. Trustee, so I can't represent

13   whether they are in agreement with that or not.

14           THE COURT:  Okay.  Anything else you would

15   like to share with me before I hear from anybody

16   else?

17           MS. JACKSON:  No, I believe that's it.

18           THE COURT:  Okay.  Great.

19           MS. JACKSON:  Thank you.

20           THE COURT:  All right.  Mr. Guso.

21           MR. GUSO:  Thank you, your Honor.

22           Your Honor, on behalf of the official

23   committee of unsecured creditors, we filed an

24   objection to the bid procedures motion, it's

25   Docket Entry Number 218.

Page 29

1          THE COURT:  I have it.

2          MR. GUSO:  This morning your Honor focused

3    the Court's inquiry in her dialogue with Ms. Jackson

4    on the narrow issues of the break-up fee and the

5    other buyer protections contained within the proposed

6    stalking horse bid.

7          THE COURT:  Uh-huh.

8          MR. GUSO:  And, your Honor, the committee

9    is concerned in respect of the bid procedures and the

10   contract that the debtor proposed be approved as the

11   initial stalking horse bid go far beyond the break-up

12   fee.  Those are itemized, your Honor, in Paragraph 9A

13   through M of our objection at Pages 3 through 6, and

14   I'm not going to recite them onto the record, your

15   Honor, and retread old ground.

16         Let me also preface my remarks with the

17   following statement, your Honor, by raising the

18   objections the committee has in the papers that

19   are before the Court, and in the argument I

20   intend to advance this afternoon, we are by no

21   means criticizing the debtor or its advisors

22   regarding its selection of the stalking horse

23   bidder for the process they proposed.

24         In my view, your Honor, the debtor has

25   done what most debtors do in the difficult

Page 30

1    circumstances of a case like this.  We have an

2    undersecured creditor, an out of money equity

3    group, and an active and participating committee

4    representing the interests of approximately

5    $3.9 million in trade debt, and so the debtor

6    negotiated the best it could and brought that

7    deal before the Court as an estate representative

8    and we believe, your Honor, that the committee,

9    as an estate representative, as well, and with

10   equal standing before this Court, discharged the

11   committee's fiduciary duty by trying to enhance

12   and improve the deal that is before the Court.

13        We did that, your Honor, by speaking to

14   representatives of Insight Equity, who are

15   present in the courtroom today.  On Monday

16   afternoon Mr. Searcy and his counsel contacted

17   the committee to invite a dialogue about the

18   terms of an asset purchase agreement that Insight

19   Equity would be prepared to advance were we to

20   support it as the stalking horse bidder.  That

21   conversation commenced Monday evening and it

22   continued through as late as this morning.

23        The Court may be wondering why a

24   proposed bidder is talking to the committee and

25   not the debtor.  Well, your Honor, as we point

1    out in our objection, one of the issues that the

2    committee had with the contract that's before

3    your Honor is Section 5.7 of the agreement.  That

4    provision, which is commonly referred to as the

5    no shop provision, in our view -- strike that, in

6    the debtor's view, impaired the debtor's ability

7    to solicit bids or negotiate terms of

8    arrangements with other parties once it had

9    signed the agreement with Boyne Capital's

10   designee.

11           From the committee's perspective, we

12   don't believe the debtor is bound by that

13   provision, and I suspect, your Honor, that if the

14   Court were to inquire of the debtor and rule

15   today that the debtor is not bound by that

16   provision, the debtor would strongly support the

17   committee's request that Insight Equity be

18   substituted as the stalking horse bidder.

19           From our view, your Honor, the economic

20   terms, the pace, and the other benefits of the

21   Insight Equity proposal, far outweigh, and are

22   far greater for the estate than the economics of

23   the Boyne Capital proposal.

24           THE COURT:  Well, let me ask you a

25   question, Mr. Guso.

Page 32

```
 1              MR. GUSO:  Sure.

 2              THE COURT:  Aren't the timing -- isn't the

 3    timing dictated by the cash collateral order?

 4              MR. GUSO:  It is.

 5              THE COURT:  So that's not really something

 6    this has to do with this agreement between the debtor

 7    and Boyne; right?

 8              MR. GUSO:  It does in this respect, your

 9    Honor.  The time line that the debtor and Boyne

10    propose in their asset purchase agreement won't work

11    unless they've been modified, and they've been

12    modified without our knowledge, because by way of

13    example, Boyne's diligence won't expire until after

14    the auction.

15              THE COURT:  I did see that.  I saw that

16    there were some time lines that didn't work.

17              MR. GUSO:  So what we have, your Honor, is

18    a debtor that faces a liquidity crunch in the third,

19    at best case, fourth week of February, and we have

20    that in the back of our mind as we negotiated with

21    Insight Equity.

22              One of the benefits of the Insight

23    Equity deal, your Honor, is it is prepared to

24    move at a faster pace than Boyne --

25              THE COURT:  Okay.
```

Page 33

```
 1              MR. GUSO:  -- commit sooner than Boyne,
 2    evidence its commitment by putting up a larger
 3    deposit and be in a position, your Honor, if it were
 4    selected as the winning bidder at the auction come
 5    before the Court, excuse me, on February 7th at the
 6    sale hearing to be selected as the winning bidder or
 7    to be ratified as the winning bidder.
 8              Your Honor, I have a -- may I approach?
 9              THE COURT:  Yes.
10              MR. GUSO:  We prepared a red line of the
11    APA which marks changes to the stalking horse bid.
12              THE COURT:  All right.  Let me just stop
13    you for a minute --
14              MR. GUSO:  Sure.
15              THE COURT:  -- Mr. Guso, and let's go back
16    to the question that I asked this morning or I
17    previewed this morning.  We're here today on the
18    debtor's motion to approve the bidding procedures,
19    the bid procedures set forth in that APA.
20              MR. GUSO:  Uh-huh.
21              THE COURT:  How is it appropriate for me
22    to, at this hearing, be looking at this marked up APA
23    when I -- what I believe I should be looking at is
24    whether I should approve these bid procedures.  Is
25    the standard that I should see if you can come up
```

1   with something better, is that an appropriate

2   consideration for me to make at this hearing?

3           MR. GUSO:  We believe the standard is as

4   follows, your Honor:  Whether in the face of a better

5   bid in the context of a liquidating case, which is

6   where we are now, it is a prudent exercise of the

7   debtor's business judgment to have your Honor approve

8   a deal that is subject to the contingencies that

9   we've identified in our objection, that is subject to

10  a financing contingency and that requires the

11  proposed purchaser to go hard after the date of the

12  auction, which is necessitated because of the

13  liquidity crunch that the debtor will face in the

14  third week of February.

15          THE COURT:  Okay.

16          MR. GUSO:  And we submit to your Honor that

17  if the debtor were to proceed with evidence today, we

18  would meet our burden, that that would be an

19  improvident exercise of the debtor's business

20  judgment.

21          Assuming your Honor were to sustain our

22  objection to the motion, my next request to the

23  Court would be to please inquire of the debtor's

24  representatives if they would be prepared to

25  amend the bid procedures motion by substituting

Page 35

1   the Boyne bid as the stalking horse bid, and I

2   suspect under those circumstances, and given

3   Ms. Jackson's remarks earlier that the debtors

4   need a bid procedures order today, that the

5   debtor would be -- the answer to that question

6   would be yes.

7             THE COURT:  All right.  I'll give you a

8   brief opportunity to present it.

9             MR. GUSO:  Thank you.

10            Your Honor, let me tell you a little

11  bit about -- open by telling you a little bit

12  about Insight Equity.  Mr. Searcy is present in

13  the courtroom.  He's seated in the last row to my

14  right.  He is a partner of Insight Equity, which

15  is a Texas based private equity firm.

16            THE COURT:  Okay.

17            MR. GUSO:  It has $800 million of capital

18  under management, 500 million -- $525 million of

19  which is committed capital that they are at will and

20  free to invest.

21            THE COURT:  Okay.

22            MR. GUSO:  Coincidentally, earlier this

23  year, Insight Equity closed on the acquisition of an

24  enterprise by the name of Berry Family of Nurseries

25  with locations in Florida, Oklahoma, Oregon,

1   Michigan, North Carolina, Tennessee and Oklahoma.

2            THE COURT:  Okay.

3            MR. GUSO:  Your Honor, Mr. Berry is also

4   present in the courtroom and can testify to those

5   facts.

6            THE COURT:  All right.  You did mention

7   that this morning.

8            MR. GUSO:  I did?

9            THE COURT:  That Mr. Berry was present in

10  the courtroom.

11           MR. GUSO:  Okay.  So what are the terms of

12  the Insight Equity proposal?

13           THE COURT:  Just highlight the differences.

14           MR. GUSO:  Sure, the material terms.

15           THE COURT:  Uh-huh.

16           MR. GUSO:  Purchase price, your Honor,

17  under the Boyne Capital proposal is 13 and a half

18  million dollars in cash, subject to adjustments, plus

19  the assumption of $300,000 in trade payables.  The

20  Insight Equity proposal is 13 and half million

21  dollars in cash, subject to the same adjustments,

22  plus $500,000 in assumed trade payables.

23           The Boyne Capital proposal contains a

24  financing contingency.  The Insight Equity

25  proposal contains no such contingency.

1          The Boyne Capital proposal would permit
2   Boyne 35 days of unfettered due diligence in
3   which to terminate its agreement.  Insight Equity
4   has requested only three weeks of due diligence
5   and would be prepared to go hard on its
6   commitment by no later than February 3rd.
7          Boyne Capital has posted a fully
8   refundable $200,000 initial deposit.  Insight
9   Equity will also post a $200,000 initial deposit.
10          Under the Boyne Capital proposal, if it
11   goes hard, it will increase its deposit from two
12   to $400,000.  Insight Equity will increase its
13   deposit from $200,000 to $750,000.  And, your
14   Honor, I note, Insight Equity was prepared to put
15   up ten percent of its bid at the time it goes
16   hard on its contract, and at the request of the
17   debtor and its advisors, agreed to reduce it to
18   750 for concerns on the debtor's part that such a
19   high deposit might chill bidding.
20          THE COURT:  Okay.
21          MR. GUSO:  As originally proposed, the
22   Boyne Capital deal required the debtors to commit to
23   pay a break-up fee of $500,000, we talked about that
24   earlier.  Here's what Boyne Capital would be entitled
25   to, if there is a competitive bid and someone else is

Page 38

1    selected, it would be entitled to expense

2    reimbursement not to exceed $300,000, that would be

3    payable from either the proceeds of the sale or a

4    forfeited deposit if another bidder is selected, but

5    fails to close.

6              THE COURT:  Okay.

7              MR. GUSO:  If we end up in a circumstance

8    where the estate has no sales proceeds or no

9    forfeited deposit, Boyne Capital would not be

10   entitled to an expense reimbursement.

11             THE COURT:  Are you talking about Boyne or

12   are you talking about --

13             MR. GUSO:  Excuse me.

14             THE COURT:  -- Insight Equity?

15             MR. GUSO:  Thank you, Insight Equity.  I

16   apologize.  Do I need to say that again?

17             THE COURT:  If you'd like to correct the

18   last two references to Boyne Capital were Insight

19   Equity.

20             MR. GUSO:  Thank you, your Honor.

21             THE COURT:  Okay.

22             MR. GUSO:  So let's talk about the time

23   line.  They are prepared, your Honor, to sign an

24   asset purchase agreement tomorrow if the Court were

25   inclined to approve it as a stalking horse bidder.

Page 39

1    As I mentioned, the due diligence period would expire

2    on February 3rd.

3              In consultation with Bank of America

4    and the debtors, your Honor, we would propose, as

5    well, that the third-party bid deadline be

6    February 3rd, that we have an auction on

7    February 7th at 10:00 a.m., and that we come

8    before your Honor on February 7th at 3:45 to

9    consider your Honor's approval of the debtor's

10   selection of the winning bidder.

11             THE COURT:  Anything else?

12             MR. GUSO:  Yes.  One point, your Honor.

13   Insight Equity would also agree to be bound and

14   remain committed to be the backup bidder, provided,

15   however, your Honor, if it is selected as the backup

16   bidder, the backup bid would be the amount of its

17   initial stalking horse bid, the 13 and a half million

18   dollars in cash, plus the $500,000 in assumed

19   liabilities.

20             THE COURT:  Okay.  That's assuming there

21   was no one else that was willing to step in in the

22   delta.

23             MR. GUSO:  Correct, your Honor.

24             THE COURT:  Okay.

25             MR. GUSO:  May I have one moment?

Page 40

```
 1              THE COURT:  Absolutely.

 2              MR. GUSO:  And lastly, your Honor, unlike

 3    the Boyne Capital proposal, the Insight Equity

 4    proposal does not contain Section 5.7, so that the

 5    debtor would not be impaired in any way from shopping

 6    the deal.

 7              THE COURT:  Okay.  Anything else?

 8              MR. GUSO:  No, your Honor.  I'm happy to

 9    answer any questions the Court may have.

10              THE COURT:  No, I have a question for

11    Ms. Jackson --

12              MR. GUSO:  Thank you, your Honor.

13              THE COURT:  -- and then I will hear from

14    whoever else wants to make a presentation.

15              All right.  Ms. Jackson, I have been

16    looking through the APA and I don't see anywhere

17    where the APA conditions the debtor's obligations

18    thereunder to approval of the APA.  In fact, when

19    I look at 5.7, the no shop provision, it

20    specifically states or suggests that this

21    particular section is binding on the debtor

22    immediately upon execution of the agreement.

23              Can you explain to me under what

24    Bankruptcy Code section the debtor can be bound

25    by a contract outside the ordinary course of
```

1   business without prior Bankruptcy Court approval?

2           MS. JACKSON:  Your Honor, I'm not aware of

3   any such provision.

4           THE COURT:  Is there case law, other courts

5   that have allowed a debtor to be bound by an APA

6   prior to court approval?

7           MS. JACKSON:  No, there is not.

8           THE COURT:  Okay.  Thank you.

9           Mr. McGill, is there a case that

10  Ms. Jackson is not aware of that you are?

11          MR. McGILL:  Not that I'm aware of,

12  your Honor.

13          THE COURT:  Okay.  Mr. Sieger, what says

14  the bank?

15          MR. SIEGER:  Good afternoon, your

16  Honor.

17          THE COURT:  You're going to extend the

18  deadlines on the cash collateral order for another

19  month so nobody needs to worry; right?

20          MR. SIEGER:  Your Honor, if extending

21  the cash collateral deadlines were the only issue

22  liquidity-wise, maybe, but there is not enough

23  cash collateral to get another month, is the

24  point.  This is a situation where there would

25  need to be a D.I.P. and that's not on the table.

Page 42

1            First of all, your Honor, at the end of

2    this, I'll tell you, I do have another couple of

3    points that were raised in our objection that

4    Ms. Jackson didn't touch on.  I think they're

5    uncontroversial and minor points, but I think the

6    question you were asking Ms. Jackson about was

7    our 363 comment that we cannot, we, the bank,

8    cannot be crammed down a stalking horse deal that

9    we don't approve of.  I'm not aware of any

10   written or verbal objection to our position, that

11   essentially can't be done without our consent.

12            As it happens, the deal that Mr. Guso

13   laid out with the Insight Equity Group is an

14   acceptable proposal to Bank of America.

15            So while I'm happy to debate the 363

16   point if your Honor or the debtor's counsel wants

17   me to, I'd just as soon leave it there.  I didn't

18   want it to be abandoned, but I think ---

19            THE COURT:  Just like those cases where or

20   those -- by cases I don't mean written cases, I mean

21   those bankruptcy cases where the Court sometimes will

22   consider confirmation issues at the disclosure

23   hearing, I don't know that necessarily, at least not

24   right at this point in the bid procedure hearing,

25   that we need to deal with what is a sale hearing

1   issue, but ---

2            MR. SIEGER:  I think that's right, your

3   Honor, and one of the points that we raised in

4   our objection, and we did this knowingly, the

5   point about what should happen to the cash

6   proceeds, I believe is also a sale hearing issue,

7   not a bid procedures hearing issue.  We raised

8   that as much as anything to put everybody on

9   notice.  That will be a discussion for a later

10  date.

11           THE COURT:  Okay.

12           MR. SIEGER:  So, your Honor, we did

13  spend the time that you kindly provided us

14  between this morning's hearing and this

15  afternoon's, working out the terms that Mr. Guso

16  represented on the record.  The bank does support

17  the deal, subject to us documenting a form of

18  order which is not prepared for your Honor today.

19  So where I come from we call that a draft order

20  to follow, but the deal is there, we are in

21  agreement with it.

22           Our objection to the Boyne deal still

23  stands, although I do share Mr. Guso's views that

24  think the debtor and debtor's professional did

25  bring a legitimate offer to the table, albeit one

1  we had objections to from the Boyne Group and we

2  would welcome the Boyne Group as a bidder at the

3  auction.  We think it was a real bid, it's just

4  not as good at this bid.

5            THE COURT:  Okay.

6            MR. SIEGER:  Circling back to the

7  points that we raised in our objection and

8  Ms. Jackson did not note in her opening remarks,

9  your Honor, there's a couple of them that we will

10  want incorporated into a final order and I don't

11  think anybody objects to, and I just want to make

12  sure that they're ---

13            THE COURT:  We're talking about a Final

14  order on the bid procedures?

15            MR. SIEGER:  Yes, I'm sorry, your

16  Honor, that's right.

17            We raised the issue that we would like

18  to receive all of the competing bids as they come

19  in, whether they eventually be deemed to be

20  qualified or not.  I don't think anybody objects

21  to that.

22            We raised the issue that we would like

23  to be consulted in determining what's highest and

24  best.  It's obviously the debtor's business

25  judgment, subject to your Honor's approval, but

Page 45

1    we would like to be in the room.  It goes along

2    with my prior statement that I, frankly, believe

3    that we're the party with skin in the game here.

4              THE COURT:  You want to watch.

5              MR. SIEGER:  We want to know what's

6    being discussed.  It may well be that we can add

7    some color to the debate, Judge.

8              THE COURT:  Well, I don't know who -- I

9    know some people that have read the All American

10   auction sale transcript, granted that went on for

11   almost 24 hours, but it got pretty colorful at the

12   end.  So, okay.

13             MR. SIEGER:  I believe Mr. Guso

14   addressed this point, but I want to just make

15   sure, that the stalking horse protections, the

16   bid protections that are going to be granted to

17   the stalking horse, don't kick in until, let's

18   say, there's a hard offer on the table with no

19   contingencies.

20             THE COURT:  I think that was confirmed this

21   morning.

22             MR. SIEGER:  Finally, the issue we

23   raised about the buyer entity being a shell and,

24   therefore, it's sort of -- you know, there's no

25   way to go back against them if there was a

Page 46

1    breach, in my mind it has been abated and we

2    withdraw that point because of the increased

3    deposit amount.

4          Oh, I'm sorry, Judge, there was one

5    other point that we also withdraw, and that is

6    the motion of the cure amounts exceeding $30,000.

7    We viewed that as sort of a bucket that could be

8    greatly exceeded and would come out of our kin.

9          We're being told that in the judgment

10   of the debtor's professionals that we've deferred

11   to, that's the right amount and if it's off, it's

12   not off by much, so we withdraw that point.

13          THE COURT:  Okay.

14          MR. SIEGER:  I would just like to say

15   that I understand your Honor's trouble with the

16   mechanics by the way this was presented.  The

17   liquidity issue the debtor's counsel raises is a

18   real issue.  There will not be a D.I.P. loan

19   coming from Bank of America on this deal.  We did

20   propose one earlier in the deal and it didn't

21   work out.

22          This was a real liquidity deadline.  I

23   would hate for this process to be derailed with

24   the transaction at stake, and jobs at stake

25   because of some procedural point.  To the extent

Page 47

1    the bank can do anything to facilitate this,

2    we're happy to make a motion, withdraw a motion,

3    object, whatever we need to do.  We think it's

4    very important, as the debtor's counsel does,

5    that we get something done here today.

6              THE COURT:  Okay.  Thank you.

7              MR. SIEGER:  Thank you.

8              THE COURT:  All right.  Anyone else wish to

9    speak?

10             Mr. McGill.

11             MR. McGILL:  Good afternoon, your Honor.

12   I'll try to set forth United's position quickly,

13   since I recognize we're short on time here.  We have

14   fully cooperated with the debtor on an expedited time

15   line up to this process, including the amendments to

16   the time line that were submitted to the Court to

17   make sure that the cash collateral concerns were

18   addressed.

19             We've made a number of amendments to

20   the purchase agreement, which you've had a chance

21   to review, and we believe that those resolve a

22   significant portion of the objections, certainly

23   not all of them, but a significant portion of the

24   objections raised by the creditors' committee,

25   Bank of America and the United States Trustee.

Page 48

1            Also, as was set forth in the record
2     this morning, we're prepared to limit our
3     break-up fee to actual expenses incurred in an
4     amount not to exceed $500,000.  However, the
5     primary purpose of a break-up fee is to protect a
6     stalking horse bidder from spending significant
7     time and effort and money to do the diligence to
8     put together a floor bid that others can come in
9     and use to potentially create new value for the
10    company.
11            And I think it's fair to say that no
12    prospective purchaser would agree to serve as a
13    stalking horse if the standard process was that
14    anyone could come in and piggyback off their
15    efforts with no possible compensation, or at
16    least protection of that risk for the stalking
17    horse and unfortunately, I think that is exactly
18    what appears to have happened today.
19            My client has been placed in a very
20    difficult position as you can imagine.  We've
21    been working on this deal since October of 2010.
22    We started incurring out of pocket expenses in
23    early December.  During that time, United engaged
24    lawyers, accountants and tax advisors, and we
25    estimate that our fees and expenses up to this

Page 49

1   point are approximately a hundred thousand

2   dollars.

3           And it was not until 9:30 a.m. this

4   morning, three minutes after the hearing on the

5   bid procedures motion was scheduled to commence,

6   that we learned of the new prospective buyer,

7   Insight, and that they were proposing to serve as

8   a stalking horse.

9           Now, they could have submitted a

10  stalking horse bid weeks ago, months ago.  They

11  could have waited until the auction to bid, but

12  instead what was done was, they used the APA that

13  we prepared, that we worked towards through our

14  diligence and then changed a few terms, and it

15  may be that that is the better deal for the

16  estate.  I can't -- you know, it depends on what

17  actually ultimately closes, and it may be that

18  will foster further bids as well, but the typical

19  process is for that to occur after the

20  protections are in place for a stalking horse,

21  and that's not what appears to be happening

22  today.

23          If our deal is not approved and Insight

24  or some other buyer successfully consummates a

25  sale of the assets that results in value being

1    provided to the estate in an amount at what we

2    were providing or some higher amount, we believe

3    that at a minimum we should be entitled to some

4    substantial contribution for the fees that we

5    have incurred to date.

6              That being said, we are fully committed

7    to the deal that we negotiated at arm's length

8    and in good faith with the debtor, and we're

9    prepared to go forward with that deal subject to

10   the concessions that you've already seen in our

11   amendment that were voiced on the record this

12   morning.

13             Unfortunately, our efforts to try to

14   negotiate that deal with the constituencies have

15   been significantly impaired by the new deal that

16   showed up this morning and that has continued to

17   be negotiated this morning.

18             And so again, to reiterate, we're

19   prepared to go forward, but we also understand --

20   we certainly understand that the debtor needs to

21   get something done today and will defer to your

22   Court ---

23             THE COURT:  Wait just a minute.

24             Ms. Jackson, I think you'd probably

25   want to listen to what Mr. McGill has to say.

1    Okay.

2                MS. JACKSON:  I apologize.

3                THE COURT:  Did you hear everything that

4    Mr. McGill had to say?

5                MS. JACKSON:  I have, your Honor.

6                THE COURT:  Okay.  I'm sorry, Mr. McGill.

7                MR. McGILL:  No problem, your Honor.

8    That's it.

9                THE COURT:  I want to emphasize something,

10   although I'm going to assume that even those

11   non-lawyer people who -- well, not the debtor's

12   folks, perhaps, but perhaps everybody here who's

13   interested in the financing are not new to this

14   process, and the thing about bankruptcy is that when

15   you're dealing with a bankruptcy sale process and

16   363, that there are some very interesting dynamics

17   that occur, including what we're seeing happening

18   here today.

19                And the flip side of that is when I

20   represented a client who had already gotten an

21   APA approved and was trying to renegotiate the

22   deal right up to the closing, because that's what

23   he used to do all the time, I had to explain to

24   that client, no, that's not how it works in

25   bankruptcy, so it is a process.

1           To the extent that your client

2    representatives are new to this process, and I

3    don't know if they are, the stalking horse is

4    never the bad guy, even when people object to the

5    stalking horse's position.

6           So I guess my question that I had for

7    you, Mr. McGill, which is the same question I

8    asked Ms. Jackson, is:  I understand the purpose

9    of no shop clauses, but the problem is that --

10   well, the problem for those who try to enforce

11   them is that until a Bankruptcy Court has

12   approved at least the bid procedures and the form

13   of the APA, there is no portion of that contract

14   that is enforceable.  I mean, that's just the

15   reality of the situation.  It's a risk that we've

16   all taken on behalf of our clients who are

17   purchasing assets.

18          From what I'm hearing from Mr. Guso,

19   but I don't know that because I haven't heard it

20   from the debtor, is that there is some issue

21   whether that no shop clause is binding, number

22   one, and whether the debtor does, in fact, want

23   to go forward with the motion that's on the table

24   right now in the form that is currently presented

25   to me, and I don't know the answer to that yet

Page 53

1    and I guess I have to ask Ms. Jackson that, but I

2    appreciate the comments that you've made, and to

3    the extent that your client is not the stalking

4    horse whose procedures I approve today, and I

5    don't know that yet, and you wish to file a

6    motion to seek substantial contribution, you

7    certainly have the right to do that and I will

8    rule on that if, and when, it is presented.

9              MR. McGILL:  Certainly.

10             THE COURT:  I'm not prejudging that at all.

11   Okay.  But as I said, as of right now, the only

12   motion before me is the motion to approve the APA

13   with your client as modified last night, as further

14   modified this morning.

15             MR. McGILL:  Thank you very much, your

16   Honor.

17             THE COURT:  Thank you.

18             Anyone else wish to address the motion

19   or the nuances that have developed?  No.

20             Mr. U.S. Trustee.

21             MR. RODRIGUEZ:  Your Honor, I don't think

22   there's any need to belabor the point.  We support

23   the committee's position.  I think Mr. Guso did an

24   excellent job pointing out the deficiencies in the

25   APA, and in light of the new deal, I think that's the

Page 54

1   way to go in this case.

2           In terms of the break-up fee, I think I

3   will let our written objection speak for itself

4   in terms of our view of it, and I have nothing

5   further unless you have any questions.

6           THE COURT:  No, I just wanted to know.

7   Anyone else?  All right.

8           So, Ms. Jackson, should I order a

9   five-minute recess, would that be a good idea?

10          MS. JACKSON:  Yes, that would be very

11  helpful.

12          THE COURT:  To the extent, you know, my

13  life being an ever developing moment, my trial

14  tomorrow has been cancelled.  So all of a sudden I

15  feel free as a bird.

16          In any event, we're going to take a

17  five-minute recess.  If you need a little bit

18  more time, you have it, just at five minutes to

19  3:00 this becomes a Judge Cristol courtroom.

20  Okay.

21          MR. GUSO:  Thank you, your Honor.

22          (Thereupon, a brief recess was taken, after

23       which the following proceedings were had:)

24          THE COURT:  Okay.  Ms. Jackson.

25          MS. JACKSON:  Your Honor, during the brief

1  recess, Boyne and United Growers have agreed and

2  acknowledged that the no shop that is in the asset

3  purchase agreement is not enforceable, and they have

4  agreed to release any claim against the estate in

5  connection with the asset purchase agreement, except

6  a possible claim for substantial contribution against

7  the estate --

8           THE COURT:  Okay.

9           MS. JACKSON:  -- and have also agreed to

10  waive any possible claim against the estate's

11  professionals, including the investment bankers.

12          They have also agreed to allow the

13  debtor to amend the motion to seek a different

14  stalking horse bidder.  Mr. Charles Honniman

15  (phonetic), the authorized representative of

16  Boyne and United Capital Growers, is here today

17  to acknowledge this agreement.

18          THE COURT:  Okay.

19          MS. JACKSON:  He's here with his counsel.

20  So with that, we do wish to amend our sale motion to

21  seek approval of Insight or BFN Foliage, as it's

22  identified in their asset purchase agreement, as the

23  stalking horse bidder, with all of the same

24  provisions that we identified in our motion, but with

25  modifications that have been identified on the record

1    and we will revise that order to adjust to everything

2    that's been announced today, and circulate it amongst

3    all of the various parties before we submit it to

4    your Honor.

5              But, your Honor, I do feel that I would

6    be remiss if I did not acknowledge Boyne and

7    United Growers for the contribution that they

8    have made to this case, and for the way that they

9    have worked with us.

10             We acknowledge that they've incurred

11   substantial legal fees, that they used

12   intellectual property and financial resources and

13   that they brought us here today.  They really set

14   the platform with their agreement, and that will

15   be the agreement from which all of the other

16   bidders submit bids.

17             So we do thank them for their

18   participation in the process, as challenging as

19   that process may be.

20             THE COURT:  Okay.

21             MS. JACKSON:  We would seek approval today

22   of the bid procedures.

23             THE COURT:  I have a question for you,

24   though.  Who's representing Insight Equity?

25             MR. GUSO:  Mr. Jillson is.

Page 57

1        THE COURT:  All right.  So Mr. Guso stated
2    that your client -- well, no, no, don't go away.
3    Come over here, Mr. Jillson, not all the way over
4    here, just over here.
5        MR. JILLSON:  I'll stop right here,
6    your Honor.
7        THE COURT:  All right.  Mr. Guso said that
8    your client is not going to be in a position to
9    execute this agreement until tomorrow.
10        So if I approve the bidding procedures
11    today and your client decides not to sign the
12    agreement, then what do we do?
13        MR. JILLSON:  Your Honor, the reason
14    why we won't be able to sign it is just because
15    we have to revise it, you know, my client is
16    getting on a plane.  But I think that in the
17    event my client would not sign the asset purchase
18    agreement, I think that the appropriate thing
19    would be to have Boyne Capital in position.
20        THE COURT:  Okay.  Thank you.
21        Do we need to take another five-minute
22    break?
23        MR. GUSO:  We do.
24        THE COURT:  I'll be back.
25        (Thereupon, a brief recess was taken, after

Page 58

1          which the following proceedings were had:)

2               MR. GUSO:  May I be heard?

3               THE COURT:  This is like the old days, you

4     know, where you had to do stuff fast.

5               Mr. Guso.

6               MR. GUSO:  Thank you, your Honor.

7     Jordi Guso on behalf of the committee.

8               Your Honor, during my remarks I handed

9     the Court an exhibit register that contained a

10    red line of an asset purchase agreement.

11              THE COURT:  This one?

12              MR. GUSO:  Yes, your Honor.  Your Honor,

13    the committee would like to move that into evidence

14    for purposes of this hearing as the Committee's

15    Exhibit Number 1.

16              THE COURT:  Any objection?  Hearing none

17    I'll admit it.

18              (Thereupon, Committee's Exhibit Number

19    1 was admitted into evidence.)

20              MR. GUSO:  Thank you, your Honor.

21              THE COURT:  Okay.

22              MR. GUSO:  Between today and tomorrow, your

23    Honor, we will revise the agreement that is before

24    the Court to incorporate the changes that were

25    announced on the record during my presentation, as to

Page 59

1  which Bank of America acknowledged its agreement, and

2  which are acceptable to Insight Equity.

3          Once those changes are done,

4  Mr. Searcy, on behalf of Insight Equity and BFN

5  Foliage, LLC, will execute the agreement and we

6  will upload an order, revised order, approving

7  the agreement and establishing the bidding

8  procedures.

9          To be clear, if Mr. Searcy or a

10 representative of Insight Equity refuses to sign,

11 I assure you that we will be back before your

12 Honor seeking appropriate relief, but we have no

13 reason to believe that will be necessary.

14          As we told the parties, what we did

15 today was not a dress rehearsal, from our

16 perspective, and this is a process that needs to

17 get underway.

18          Thank you for your time.

19          THE COURT:  Just so that I'm clear, then,

20 that assuming that this agreement is executed with

21 the corrections made on the record, because we did

22 not or I did not go through it thoroughly, I just

23 glanced at it during your remarks, is that the issues

24 regarding the bid procedures and the break-up fee

25 have been resolved by this agreement, is that

Page 60

1    correct, Mr. Guso?

2            MR. GUSO:  Yes, your Honor.

3            THE COURT:  Okay.  So I'm not going to get

4    another round of objections to the break-up fee?

5            MR. GUSO:  No, your Honor, there is no

6    break-up fee.  There is an expense reimbursement

7    capped at $300,000 and it is only payable if there is

8    an alternative transaction that closes or if there is

9    a deposit that is tendered by a competing bidder

10   that's forfeited.

11           THE COURT:  Okay.  All right.  Ms. Jackson,

12   any additional remarks that you would like to make?

13           MS. JACKSON:  Your Honor, we can -- just

14   for the record, we can file a notice of amendment of

15   the sale motion so that it's clear.  We'll circulate

16   the bid procedures order to the committee, the U.S.

17   Trustee, Bank of America and any other interested

18   parties who are here, so that we can all agree on the

19   terms and substitute the stalking horse.

20           THE COURT:  Mr. Guso.

21           MR. GUSO:  That's fine, your Honor, and for

22   the avoidance of any doubt whatsoever, I would ask

23   the Court to inquire of Mr. Jillson if my statements

24   to your Honor are acceptable to Insight Equity.

25           THE COURT:  Okay.  I am going to do that

Page 61

1    next.

2              MR. GUSO:  Thank you, your Honor.

3              MR. JILLSON:  Your Honor, the

4    description of the changes to the asset purchase

5    agreement by Mr. Guso are acceptable to Insight

6    Equity and Insight Equity expects to be signing

7    an APA containing those terms.

8              THE COURT:  Okay.  Thank you.  Otherwise

9    everyone here knows where you live.  No, I'm just

10   kidding.

11             MR. JILLSON:  Thank you, your Honor.

12             THE COURT:  All right.  Does anyone else

13   wish to address the Court with respect to the matters

14   that I have heard here today?

15             All right.  Then I will look for the

16   order and I will let Ms. Sanabria know the

17   afternoon of February 7th after 3:30 belongs to

18   all of you, or whatever time it was that I

19   stated, and I look forward to seeing you all

20   then.

21             Mr. McGill, I want to thank you and

22   your client for all the efforts that they've

23   made, and to the extent you choose to make a

24   substantial contribution motion, as I said, I

25   will consider that at the time that it's filed.

1              Okay.  All right.  Thank you all very

2    much.  For those of you travelling, safe travels

3    home.

4              MR. GUSO:  Thank you, your Honor.

5              MS. JACKSON:  Thank you, your Honor.

6              (Thereupon, the above-proceedings were

7    concluded.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 63

```
 1                    CERTIFICATION
 2   STATE OF FLORIDA:
 3   COUNTY  OF  DADE:
 4              We, Carmen de la Cruz and Margaret
 5   Franzen, Shorthand Reporters and  Notaries  Public
 6   in  and for the State of Florida at  Large,  do
 7   hereby  certify  that  the  foregoing proceedings
 8   were  taken  before  us  at the date and place  as
 9   stated  in  the caption hereto on  Page 1; that the
10   foregoing  computer-aided transcription  is  a true
11   record of our  stenographic notes taken at said
12   proceedings.
13              WITNESS  our  hands this  18th  day
14   of January, 2011.
15
16
17        _____
                     Carmen de la Cruz
18           Court Reporter and Notary Public
          in and for the State of Florida at Large
19           My Commission Expires:  August 2011
20
21
22        _____
                     Margaret Franzen
23           Court Reporter and Notary Public
          in and for the State of Florida at Large
24           My Commission Expires:  April 14, 2014
25
```