

ORDERED in the Southern District of Florida on February 09, 2011.

Laurel M. Isicoff, Judge
United States Bankruptcy Court

_____

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF FLORIDA

|  |  |  |
|---|---|---|
| In re | ) | Chapter 11 |
|  | ) |  |
| First Foliage, L.C., | ) | Case No. 10-27532-BKC-LMI |
|  | ) |  |
| Debtor. | ) |  |

**ORDER (A) AUTHORIZING SALE OF THE DEBTOR'S ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS, (B) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**

This matter is before the Court on the motion (the "Sale Motion"), Docket No. 204, dated January 7, 2011, of debtor-in-possession First Foliage, L.C. (the "Debtor" or "Seller") for entry of an order, pursuant to §§ 105(a), 363, 365, and 1146 of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 2002, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") (a) authorizing the sale (the "Sale") to Costa Farms, LLC ("Buyer") pursuant to that certain Asset Purchase Agreement by and between the Seller and the Buyer dated February 9, 2011 (the "APA," attached hereto as ***Exhibit A***) of

substantially all of the Purchased Assets[1] of the Debtor free and clear of all liens, claims, encumbrances and other interests, (b) authorizing the assumption and assignment of certain executory contracts and unexpired leases in connection therewith, as also requested in (i) the Debtor's Motion for Entry of an Order Approving Assumption and Assignment of Unexpired Nonresidential Real Property Leases, or, in the Alternative, Further Extending the Time within which to Assume or Reject Unexpired Leases of Nonresidential Real Property (Docket No. 227) and (ii) the Debtor's Motion for Entry of an Order Approving Assumption and Assignment of Executory Contracts (Docket No. 234) (collectively, the "Assumption and Assignment Motions"), and (c) granting related relief. The Court heard statements of counsel and the evidence presented in support of the relief requested by the Debtor in the Sale Motion at a hearing before the Court on February 8, 2011 (the "Sale Hearing"). Based on the evidence presented at the Sale Hearing, the arguments of counsel, the applicable pleadings in this Bankruptcy Case, and the applicable law, and after due deliberation thereon,

THE COURT HEREBY FINDS AND DETERMINES THAT:

## I.    Jurisdiction, Final Order, and Statutory Predicates

A.    The Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334(a). This is a core proceeding pursuant to 28 U.S.C. §

---

[1] Undefined capitalized terms in this Order shall be ascribed the same definitions as are in the APA and the Court's *Order (A) Authorizing and Approving Bidding Procedures for the Sale of Substantially All the Debtor's Assets, Free and Clear of All Liens, Claims, And Encumbrances; (B) Approving Form of Purchase Agreement, Including a Combined Break Up Fee and Expense Reimbursement; (C) Scheduling an Auction and Final Hearing to Consider Approval of the Sale, Including the Assumption and Assignment Of Executory Contracts And Unexpired Leases; (D) Approving Form and Manner of Notice of Bidding Procedures, Auction and Sale Hearing*, Docket No. 224, dated January 14, 2011 (the "Bid Procedures Order").

157(b)(2)(A), (M), (N) and (O).  Venue is proper in this District and in the Court pursuant to 28 U.S.C. §§ 1408 and 1409.

        B.      Upon entry, this Order constitutes a final and appealable order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Order, and expressly directs entry of judgment as set forth herein.

        C.      The statutory predicates for the relief requested in the Sale Motion are sections 105, 363, 365, and 1146 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014.

        D.      The Court entered the Bid Procedures Order on January 14, 2011, Docket No. 224.

        E.      Pursuant to the terms and procedures established in the Bid Procedures Order, the Debtor conducted an auction of substantially all of the Debtor's assets on February 7, 2011 (the "Auction").

        F.      The findings of fact and conclusions of law set forth herein constitute the Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014.

        G.      To the extent any of the following findings of fact constitute conclusions of law, they are hereby adopted as such.  To the extent any of the following conclusions of law constitute findings of fact, they are hereby adopted as such.  Any findings of fact or conclusions

of law stated by the Court on the record at the Sale Hearing are hereby incorporated, to the extent they are not inconsistent herewith.

H.      In the absence of a stay pending appeal, Buyer will be acting in good faith pursuant to § 363(m) of the Bankruptcy Code in closing the transaction contemplated by the APA at any time on or after entry of this Sale Order, and cause has been shown as to why this Sale Order should not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

## II.      Notice of the Sale, Auction and the Cure Amounts

A.      The Bid Procedures Order, which includes actual written notice of the Sale Hearing, the Auction, the Sale Motion, the Sale, the assumption, assignment, and sale of all executory contracts and unexpired leases set forth in Schedules 1.1(b) and 1.1(c) to the Purchase Agreement (collectively, the "Assigned Contracts"), and a reasonable opportunity to object or be heard with respect to such matters has been afforded to all known interested persons and entities, including, but not limited to the following parties (the "Notice Parties"):

1.      the United States Trustee;

2.      counsel to the Official Committee of Unsecured Creditors appointed in this Bankruptcy Case (the "Committee");

3.      counsel to the agent for the Debtor's prepetition secured lenders;

4.      all taxing authorities having jurisdiction over any of the Purchased Assets, including the Internal Revenue Service;

5.      all parties that have requested special notice pursuant to Bankruptcy Rule 2002;

6.      all persons or entities known to the Debtor that have or have asserted a lien on, claim against, encumbrance upon, and security interest or other interest in, all or any portion of the Purchased Assets;

7.      all non-Debtor parties to each Assigned Contract that the Debtor proposes to assume and assign to Buyer (each a "Contract CounterParty");

8.      counsel to Buyer;

9.      Transferred Employees and Employees; and

10.     all potential bidders previously identified or otherwise known to the Debtors.

B.      In accordance with the provisions of the Bid Procedures Order, the Debtor has served notice (the "Cure Notice") upon Buyer and the Contract Counter Parties: (i) that the Debtor seeks to assume and assign the Assigned Contracts at the Closing Date; and (ii) of the relevant Cure Amounts.[2]  The service of such Cure Notice was good, sufficient and appropriate under the circumstances and no further notice need be given in respect of establishing a Cure Amount for the Assigned Contracts.  Buyer and the Contract CounterParties have had an opportunity to object to the Cure Amounts set forth in the Cure Notice.

C.      The Debtor has articulated good and sufficient reasons for the Court to grant the relief requested in the Sale Motion regarding the sales process, including, without limitation: (i) determination of final Cure Amount; and (ii) approval and authorization to serve Bid Procedures Order.

D.      The Bid Procedures Order provided all interested parties with timely and proper notice of the Sale, Sale Hearing, and Auction.

E.      The Cure Notice provided Buyer and the Contract CounterParties with proper notice of the potential assumption and assignment of the Assigned Contracts and any Cure Amount relating thereto, and the procedures set forth therein with regard to any such Cure Amount to satisfy the provisions of  § 365 of the Bankruptcy Code.

F.      As evidenced by the affidavits of service previously filed with the Court and the orders of the Court, proper, timely, adequate and sufficient notice of the Sale Motion,

---

[2] These Cure Amounts are the same as the Cure Costs discussed in the APA.

Auction, Sale Hearing and Sale has been provided in accordance with §§ 102, 363, 365 and 1146 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, and 9014.  The Debtor also has complied with all obligations to provide notice of the Auction, Sale Hearing and Sale required by the Bid Procedures Order.  The notices described in paragraphs A to E above were good, sufficient and appropriate under the circumstances, and no other or further notice of the Sale Motion, Auction, Sale Hearing, Sale, or assumption, assignment and sale of the Assigned Contracts is required.

G.    The disclosures made by the Debtor concerning the Sale Motion, APA, Auction, Sale, and Sale Hearing, including but not limited to the facts alleged in the Sale Motion, the Assumption and Assignment Motions, and other pleadings filed with the Court, and the evidence and arguments presented and proffered at the Sale Hearing and other hearings before the Court, were good, complete and adequate.

## III.    Good Faith of Buyer

A.    Buyer is not an "insider" of the Debtor, as that term is defined in § 101(31) of the Bankruptcy Code.

B.    Buyer is purchasing the Purchased Assets in good faith and is a good faith buyer within the meaning of § 363(m) of the Bankruptcy Code, and is therefore entitled to the full protection of that provision, and otherwise has proceeded in good faith in all respects in connection with this proceeding in that, inter alia: (a) Buyer recognized that the Debtor was free to deal with any other party interested in acquiring the Purchased Assets; (b) Buyer complied with the provisions in the Bid Procedures Order; (c) Buyer agreed to subject its bid to the competitive bidding procedures set forth in the Bid Procedures Order; (d) Buyer in no way induced or caused the chapter 11 filing by the Debtor; (e) all payments to be made by Buyer and other agreements or arrangements entered into by Buyer in connection with the Sale have been

disclosed; (f) Buyer has not violated § 363(n) of the Bankruptcy Code by any action or inaction; (g) no common identity of directors or controlling stockholders exists between Buyer and the Debtor; and (h) the negotiation and execution of the APA and any other agreements or instruments related thereto were at arms' length and in good faith.

C.      Buyer has not joined or otherwise in any way colluded with any potential purchaser of the Debtor's Purchased Assets and has not otherwise taken any action to limit or restrict the consideration to be paid to the Debtor for the Purchased Assets.

**IV.    Highest and Best Offer**

A.      Prior to selecting a stalking-horse bidder, the Debtor solicited offers to acquire the Purchased Assets from a wide variety of parties. In addition to such solicitations, evidence of which was presented at the Sale Hearing, the Debtor scheduled the Auction in accordance with the provisions of the Bid Procedures Order. The Debtor, the Committee and the Lender deemed each of BFN Foliage, LLC ("BFN") and Costa Farms, LLC ("Costa") a Qualified Bidder. Each of BFN and Costa participated in the Auction. This Auction, which was conducted and completed in compliance with the procedures established in the Bid Procedures Order, afforded a full, fair and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Purchased Assets. The Auction was duly noticed and provided opportunity for a non-collusive, fair and good faith sale process, and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Purchased Assets.

B.      The APA constitutes the highest and best offer for the Purchased Assets, and will provide a greater benefit for the Debtor's estate than would be provided by any other available alternative. The Debtor's determination that the APA constitutes the highest and best

offer for the Purchased Assets constitutes a valid and sound exercise of the Debtor's business judgment.

C. The APA represents a fair and reasonable offer to purchase the Purchased Assets under the circumstances of these chapter 11 cases. No other person or entity or group of entities has offered to purchase the Purchased Assets for greater overall benefit to the Debtor's estate than Buyer, as determined by the Debtor in its business judgment (in consultation with the Lender (as defined below) and the Committee, which judgment the Court finds reasonable and appropriate in its selection of Buyer as successful bidder upon the Debtor's full consideration of all the bids submitted at the Auction and the terms thereof.

D. Approval of the Sale Motion and the APA and the consummation of the transactions contemplated thereby is in the best interests of the Debtor, its creditors, its estate and other parties in interest.

E. The Buyer has demonstrated that it has the financial wherewithal to close and consummate the Sale and meet all financial obligations under the APA.

F. The Debtor has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the Sale prior to, and outside of, a plan of reorganization.

## V. No Fraudulent Transfer

A. The consideration provided by Buyer pursuant to the APA is fair and adequate and constitutes reasonably equivalent value and fair consideration under the Bankruptcy Code and under the laws of the United States, any state, territory, possession and the District of Columbia.

**VI.    Validity of Transfer**

A.    The Debtor has full corporate power and authority to execute and deliver the APA and all other documents contemplated thereby, and no further consents or approvals are required for the Debtor to consummate the transactions contemplated by the APA, except as otherwise set forth in the APA.

B.    The transfer of each of the Purchased Assets to Buyer will be as of the Closing Date a legal, valid, and effective transfer of the Purchased Assets, and vests or will vest Buyer with all right, title, and interest of the Debtor to the Purchased Assets free and clear of all claims, liens, encumbrances and other interests (collectively, "Interests"), including, but not limited to (i) all deeds of trust and security interests in favor of or for the benefit of any secured lender, including, without limitation, any replacement liens previously granted to any such party by any order of this Court; (ii) those that purport to give to any party a right or option to effect any forfeiture, modification, right of first refusal or termination of Debtor's or Buyer's interest in the Purchased Assets, or any similar rights; (iii) those relating to taxes arising under or out of, in connection with, or in any way relating to the operation of the Debtor's business or any of the Purchased Assets prior to the Closing; and (iv) (a) those arising under all mortgages, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens, judgments, demands, encumbrances, rights of first refusal or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership and (b) all debts arising in any way in connection with any agreements, acts or failures to act of the Debtor or any of its predecessors or affiliates, claims (as that term is defined in section 101(5) of the Bankruptcy Code), obligations, liabilities, demands, guaranties, options, rights, contractual or other commitments, restrictions, interests and matters of any kind and nature, whether known or unknown, contingent or otherwise, whether

9

arising prior to or subsequent to the commencement of the Bankruptcy Case, and whether imposed by agreement, understanding, law, equity or otherwise, including, but not limited to, claims otherwise arising under doctrines of successor liability to the greatest extent permitted by applicable law.

## VII.    Section 363(f) Is Satisfied

A.    Buyer represents that it would not have entered into the APA and would not consummate the transactions contemplated thereby (by paying the Purchase Price and assuming the Assumed Liabilities set forth in the APA) if the sale of the Purchased Assets to Buyer, and the assumption, assignment, and sale of the Assigned Contracts to Buyer were not free and clear of all Interests, or if Buyer would be liable, or in the future could be liable, for any of such Interests, including, but not limited to, liens or claims in respect of the following: (1) any labor agreements; (2) all mortgages, deeds of trust, and security interests; (3) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of any Debtor; (4) any other employee, worker's compensation, occupational disease, or unemployment or temporary disability related claim, including, without limitation, claims that might otherwise arise under or pursuant to (a) the Employee Retirement Income Security Act of 1974, as amended, (b) the Fair Labor Standards Act, (c) Title VII of the Civil Rights Act of 1964, (d) the Federal Rehabilitation Act of 1973, (e) the National Labor Relations Act, (f) the Worker Adjustment and Retraining Act of 1988, (g) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (h) the Americans with Disabilities Act of 1990, (i) the Consolidated Omnibus Budget Reconciliation Act of 1985, (j) state discrimination laws, (k) state unemployment compensation laws or any other similar state laws, or (1) any other state or federal benefits or claims relating to any employment with the Debtor or any of its respective predecessors; (5) any bulk sales or

similar law; (6) any tax statutes or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; (7) any environmental law(s); and (8) any theories of successor liability.

B.     The Debtor may sell the Purchased Assets free and clear of all Interests (other than the Assumed Liabilities) in or against the Debtor, its estate, and any of the Purchased Assets because, in each instance, one or more of the standards set forth in § 363(f)(1)-(5) of the Bankruptcy Code has been satisfied.  Those holders of Interests in or against the Debtor, its estate, or any of the Purchased Assets who did not object, or - as to Bank of America, N.A., as Agent for the senior secured lenders (collectively, "Lender") - who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented pursuant to § 363(f)(2) of the Bankruptcy Code.  Those holders of such Interests who did object fall within one or more of the other subsections of § 363(f) and are adequately protected by having their Interests, if any, in each instance in or against the Debtor, its estate, or any of the Purchased Assets, attach to the cash proceeds of the Sale ultimately attributable to the Purchased Assets in which such creditor alleges an interest, in the same order of priority, with the same validity, force and effect that such creditor had prior to the Sale, subject to any claims and defenses the Debtor and its estate may possess with respect thereto.

## VIII.   Assumption and Assignment of the Assigned Contracts

A.     The assumption and assignment of the Assigned Contracts pursuant to the terms of this Order is integral to the APA and is in the best interests of the Debtor and its estate, creditors, and other parties in interest, and represents the reasonable exercise of sound and prudent business judgment by the Debtor.

B.    The Cure Amounts set forth in Schedule 1.1(d)(iii) to the APA are the sole amounts necessary under §§ 365(b)(1)(A) and (B) and 365(f)(2)(A) of the Bankruptcy Code to cure all monetary defaults and pay all actual pecuniary losses under the Assigned Contracts.

C.    Pursuant to the express terms of the APA, the Debtor will: (i) cure and/or provide adequate assurance of cure of any monetary default existing prior to the Closing Date under any of the Assigned Contracts, within the meaning of § 365(b)(1)(A) of the Bankruptcy Code; (ii) provide compensation or adequate assurance of compensation to any party for actual pecuniary loss to such party resulting from a default prior to the Closing Date under any of the Assigned Contracts, within the meaning of § 365(b)(1)(B) of the Bankruptcy Code.  Buyer has demonstrated adequate assurance of its future performance under the relevant Assigned Contracts within the meaning of §§ 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

## IX.    Compelling Circumstances for an Immediate Sale

A.    To enhance the Debtor's level of liquidity, to avoid a cessation of the Debtor's operations caused by a lack of cash and the resulting loss of value to the estate, and to maximize the amount of funding available to provide for a timely exit from this chapter 11 cases, it is essential that the Sale of the Assets occur within the time constraints set forth in the APA. Time is of the essence in consummating the Sale.

B.    Given all of the circumstances of this chapter 11 case and the adequacy and fair value of the purchase price under the APA, the proposed Sale of the Purchased Assets to Buyer constitutes a reasonable and sound exercise of the Debtor's business judgment and should be approved.

C.    The consummation of the transaction is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation,

§§ 105(a), 363(b), 363(f), 363(m), 365(b) and 365(f), and all of the applicable requirements of such sections have been complied with in respect of the transaction.

**X.      Bank of America Pay-Off Amount and Use of Sale Proceeds**

A.      The Lender is the senior secured creditor of the Debtor, holding valid liens, claims, interests and encumbrances in, on and against the Debtor's Cash Collateral and the Lender's Prepetition Collateral (as defined in the Cash Collateral Order (defined below)), arising in connection with that certain Second Final Order Extending Debtor's Authorization to Use Cash Collateral and Granting Adequate Protection and additional relief and certain preceding interim cash collateral orders (Docket Nos. 30, 48, 70, 116 and 198, collectively, the "Cash Collateral Order") and under which Lender holds an allowed secured claim, not subject to subordination and otherwise unavoidable for all purposes in the Bankruptcy Case and any subsequent chapter 7 case, against the Debtor for principal, accrued interest and reimbursable fees and expenses as of January, 2011 in an approximate amount of $24,359,885, plus interest, fees and reasonable expenses accrued thereafter and while the obligations owed to Lender remain outstanding (collectively, the "Lender Payoff Amount").  Pursuant to the Cash Collateral Order, the Investigation Period (as defined in the Cash Collateral Order) has expired.

B.      The Debtor shall apply the proceeds of the Sale (the "Sale Proceeds") in accordance with the Cash Collateral Order and as set forth herein.

C.      As stated on the record of the February 8, 2011 hearing, following the Closing as contemplated in the APA, Lender intends to either dismiss the pending (insert Dist Ct case caption) without prejudice or work with the USDA and SBA guarantors to release those defendants' guarantees as promptly as possible; provided, however, that Lender does not speak for the USDA or SBA and can only represent that, for its own benefit, it does not intend to prosecute the pending guaranty litigation.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT:

## General Provisions

1.     The relief requested in the Sale Motion is granted and approved, and the Sale contemplated thereby is approved as set forth in this Order.

2.     This Court's findings of fact and conclusions of law, set forth in the Bid Procedures Order, are incorporated herein by reference.

3.     All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled as announced to the Court at the Sale Hearing or by stipulation filed with the Court, and all reservations of rights included therein, are hereby overruled on the merits or the interests of such objections have been otherwise satisfied or adequately provided for.

## Approval of the APA

4.     The APA and all other ancillary documents, and all of the terms and conditions thereof, are hereby approved.

5.     Pursuant to § 363(b) of the Bankruptcy Code, the Debtor is directed and authorized to take any and all actions necessary or appropriate to (i) cooperate with the Buyer to consummate the Sale of each of the Purchased Assets to Buyer pursuant to and in accordance with the terms and conditions of the APA and this Order, (ii) close the Sale as contemplated in the APA and this Order, and (iii) execute and deliver, perform under, consummate, implement, and close fully the APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the APA and the Sale, including any other ancillary documents, or as may be reasonably necessary or appropriate to the performance of the obligations as contemplated by the APA and such other ancillary documents.

14

6.     This Order shall be binding in all respects upon the Debtor, its estate, all holders of equity interests in the Debtor, all holders of any Interests (whether known or unknown) in or against the Debtor or all or any portion of the Purchased Assets, all Contract CounterParties, any Qualified Bidders (other than Buyer), Buyer and all successors and assigns of Buyer, the Purchased Assets, the Committee, and any trustees, if any, subsequently appointed in the Bankruptcy Case or upon a conversion to chapter 7 under the Bankruptcy Code of the Bankruptcy Case.  This Order and the APA shall inure to the benefit of the Debtor, its estate and creditors, Buyer, and their respective successors and assigns.

7.     The Debtor is directed and authorized to pay or cause to be paid to Lender at Closing and in partial satisfaction of the debt owing to the Lender, by wire transfer of immediately available funds to an account designated by Lender, all Sale Proceeds, up to the Lender Payoff Amount, less:  (a) the Break-Up Fee owed to BFN pursuant to the Bid Procedures Order (in an amount not to exceed $300,000), (b) $700,000 to pay professional fees of the professionals for the Committee and the Debtor (the "Unpaid Professional Fee Set Aside"), which amount shall be transferred from the Escrow Agent to Debtor's Counsel at Closing to be held in retainer subject to final fee application and prior court interim payment orders, and with any unused portion to be returned to the Lender , (c) tax claims in favor of Miami-Dade County and Lake County in the aggregate amount of $109,582.35, which claims shall be paid directly from the Sale Proceeds, (d) up to $30,000 of Cure Costs owing to Contract CounterParties, provided, however, that the Debtor shall pay from the Sale Proceeds or available cash any Cure Costs in excess of $30,0000, (e) up to $572,000, reflecting the amount budgeted pursuant to the Cash Collateral Order, (f) $25,000 to be applied to cover post-Closing expenses of the Debtor; (g)  $150,000 (the "Unsecured Creditor Set Aside") for the exclusive benefit of the holders of

allowed, general unsecured claims (excluding, however, any unsecured, deficiency claim of Lender) against the Debtor's bankruptcy estate (the "Allowed General Unsecured Claims").  The Unsecured Set Aside shall be delivered by wire transfer to the trust account of Berger Singerman, P.A., counsel to the Official Committee of Unsecured Creditors, and shall be held in trust to be distributed to the holders of Allowed Unsecured Claims (other than the Lender) pursuant to (a) further order of this Court, (b) the terms of a plan of reorganization for the Debtor, or (c) by a Chapter 7 Trustee should the case be converted.  The Unsecured Creditor Set Aside  and the Unpaid Professional Fee Set Aside is given by the Lender from Sale Proceeds otherwise distributable to it pursuant to this Order, and does not constitute property of the Debtor's bankruptcy estate; and (h) the Transaction Fee (as described below).  Effective as of the Closing, the Lender shall be deemed to have waived and release any claim against or lien upon the Sale Proceeds Set Aside and the Unpaid Professional Fee Set Aside.  Notwithstanding the foregoing, the $217,000 allocated to crop insurance on the closing statement and the $572,000 in section (e) above shall be held by Debtor's counsel in escrow pending agreement of the Lender and the Debtor or further order of the Court.

8.    The Debtor is authorized and directed to pay its investment banker, Bayshore Partners, LLC, ("Bayshore") the Transaction Fee (as that term is defined in Bayshore's Court-approved retention agreement), as has been modified by agreement among the parties as set forth on the record at the Sale Hearing, with wired funds at the Closing, in an amount equal to $735,000 plus reimbursement of outstanding expenses in the amount of $851.32 from the Sale Proceeds in accordance with 11 U.S.C. 328(a), free and clear of any Interest that any creditor or claimant may possess in the relevant assets sold or proceeds received in connection with the sale transaction, as contemplated by the Order Granting Emergency Application for Entry of An

Order Authorizing Retention and Employment of Bayshore Partners, LLC as Investment Banker to the Debtor ("Bayshore Retention Order").  Bayshore has been paid a total of $135,833 in monthly fees and reimbursed $1,847.79 in expenses to date.  Pursuant to an agreement among the parties, there shall be no credit or other adjustment to the $735,000 Transaction Fee and the total amount due to Bayshore at Closing is $735,851.32.  The Transaction Fee, all monthly fees and expense reimbursements previously paid to Bayshore are approved hereby. Pursuant to Bayshore's Retention Order, Bayshore is not required to file fee applications and this paragraph shall constitute a final award of all fees and expenses owed, and previously paid, to Bayshore in this case.

9.     The quarterly fees owing to the United States Trustee shall be current as of the Closing.

10.     In addition, except as provided for in paragraph 7, the Debtor is directed and authorized to remit, or cause to be remitted, to Lender on the day of the Closing all of its cash or otherwise available funds, wherever located, up to the remaining balance of the Lender Payoff Amount, by wire transfer of immediately available funds to an account designated by Lender, in partial satisfaction of debt owing to the Lender.

**Transfer of the Purchased Assets**

11.     Pursuant to §§ 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Debtor is authorized to transfer the Purchased Assets on the Closing Date.  Such Purchased Assets shall be transferred to Buyer upon and as of the Closing Date and such transfer shall constitute a legal, valid, binding, and effective transfer of such Purchased Assets and, with the consent of Lender and upon the Debtor's receipt of the Purchase Price, shall be free and clear of all Interests.  Upon the Closing, Buyer shall take title to and possession of the Purchased Assets. Pursuant to § 363(f) of the Bankruptcy Code, the transfer of title to the Purchased Assets and the

17

Assigned Contracts shall be free and clear of (a) any and all Interests; (b) any and all liabilities except for Assumed Liabilities; and (c) any and all claims including, without limitation, any and all claims pursuant to any successor or successor-in-interest liability theory; provided, however, that Buyer shall not be relieved of liability with respect to the Assumed Liabilities, including any obligations accruing under the Assigned Contracts from and after the Closing.  All Interests shall attach solely to the proceeds of the Sale with the same validity, priority, force, and effect that they now have as against the Purchased Assets, subject to any claims and defenses the Debtor and its estate may possess with respect thereto.

12.    Except as expressly provided by the APA with respect to the Assumed Liabilities, all persons and entities holding Interests in all or any portion of the Purchased Assets arising under or out of, in connection with, or in any way relating to the Debtor, the Purchased Assets, the operation of the Debtor's business prior to the Closing Date, or the transfer of the Purchased Assets to Buyer, and any Qualified Bidders (other than Buyer), hereby are forever barred, estopped and permanently enjoined from asserting against Buyer or its successors or assigns, their property, or the Purchased Assets, such persons' or entities' Interests in or against the Debtor or the Purchased Assets.  On the Closing Date, each creditor is authorized and directed to execute such documents and take all other actions as may be deemed by Buyer to be necessary or desirable to release Interests on the Purchased Assets, if any, as provided for herein, as such Interests may have been recorded or may otherwise exist.  The transactions authorized herein shall be of full force and effect, regardless of the Debtor's lack of good standing in any jurisdiction in which the Debtor is formed or authorized to transact business or other circumstances.  Upon consummation of the transactions set forth in the APA, Buyer shall be authorized to file termination statements or lien terminations in any required jurisdiction to

remove any record, notice filing, or financing statement recorded to attach, perfect, or otherwise notice any Interest that is extinguished or otherwise released pursuant to this Order under § 363 and the related provisions of the Bankruptcy Code.

13. All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtor to sell and transfer the Purchased Assets to Buyer in accordance with the terms of the APA and this Order.

14. All persons and entities that are in possession of some or all of the Purchased Assets on the Closing Date are directed to surrender possession of such Purchased Assets to Buyer or its assignee at the Closing.

15. A certified copy of this Order may be filed with the appropriate clerk or other official or similar person or institution and/or recorded with the recorder or other official or similar person or institution to act to cancel any of the Interests of record.

16. If any person or entity which has filed statements or other documents or agreements evidencing Interests in or against all or any portion of the Purchased Assets shall not have delivered to the Debtor prior to the Closing, in proper form for filing and executed by the appropriate parties, termination statements, instruments of satisfaction, releases of liens and easements, and any other documents necessary or desirable to Buyer for the purpose of documenting the release of all Interests, which the person or entity has asserted or may assert with respect to all or any portion of the Purchased Assets, the Debtor is hereby authorized and directed, and Buyer is hereby authorized, to execute and file such statements, instruments, releases, and other documents on behalf of such person or entity with respect to the Purchased Assets.

17.     This Order is and shall be binding upon and govern the acts of all persons and entities, including, without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any lease; and each of the foregoing persons and entities is hereby directed to accept for filing any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the APA.

**Assigned Contracts**

18.     Upon the Closing of the Sale, the Debtor is authorized and directed to assume and assign the Assigned Contracts to Buyer free and clear of all Interests, as described herein.  The payment of the applicable Cure Amounts (if any) by the Debtor shall (a) effect a cure of all defaults existing thereunder as of the Closing Date, (b) compensate for any actual pecuniary loss to such non-Debtor party resulting from such default, and (c) together with the assumption of the Assigned Contracts by Buyer, constitute adequate assurance of future performance thereof. Buyer shall then have assumed the Assigned Contracts and, pursuant to § 365(f) of the Bankruptcy Code, the assignment by the Debtor of such Assigned Contracts shall not be a default thereunder.  After the payment of the relevant Cure Amounts by the Debtor, neither the Debtor nor Buyer shall have any further liabilities to the Contract CounterParties other than Buyer's obligations under the Assigned Contracts that accrue and become due and payable on or after the Closing Date.

19.    Any provisions in any Assigned Contracts that prohibit or condition the assignment of such Assigned Contracts or allow the party to such Assigned Contracts to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon the assignment of such Assigned Contract constitute unenforceable anti-assignment provisions that are void and of no force and effect.  All other requirements and conditions under §§ 363 and 365 of the Bankruptcy Code for the assumption by the Debtor and assignment to Buyer of the Assigned Contracts have been satisfied.  Upon the Closing, in accordance with §§ 363 and 365 of the Bankruptcy Code, Buyer shall be fully and irrevocably vested with all rights, title, and interests of the Debtor under the Assigned Contracts.

20.    Upon the Closing and the Debtor's payment of the relevant Cure Amounts, if any, Buyer shall be deemed to be substituted for the Debtor as a party to the applicable Assigned Contracts and the Debtor shall be relieved, pursuant to § 365(k) of the Bankruptcy Code, from any further liability under the Assigned Contracts.

21.    Upon the payment of the applicable Cure Amount by the Debtor (pursuant to the terms of the APA), the Assigned Contracts will remain in full force and effect, and no default shall exist under the Assigned Contracts, nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default.

22.    There shall be no rent accelerations, assignment fees, increases, or any other fees charged to Buyer or the Debtors as a result of the assumption and assignment of the Assigned Contracts.

23.    Pursuant to §§ 105(a), 363, and 365 of the Bankruptcy Code, all Contract CounterParties are forever barred and permanently enjoined from raising or asserting against Buyer any assignment fee, default (including those arising from monetary and non-monetary

obligations), breach, claim, pecuniary loss, or condition to assignment arising under or related to the Assigned Contracts existing as of the Closing Date or arising by reason of the Closing.

### Miscellaneous Provisions

24.      Effective upon the Closing Date and except as otherwise provided by stipulations filed with or announced to the Court with respect to a specific matter, all persons and entities are forever prohibited and permanently enjoined from commencing or continuing in any manner any action or other proceeding, whether in law or equity, in any judicial, administrative, arbitral or other proceeding against Buyer, its successors and assigns, or the Purchased Assets, with respect to any (a) Interests arising under, out of, in connection with or in any way relating to the Debtor, Buyer, the Purchased Assets, or the operation of the Purchased Assets prior to the Closing of the Sale, or (b) successor liability, including, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding against Buyer, its successors or assigns, assets, or properties; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against Buyer, its successors, assets, or properties; (iii) creating, perfecting, or enforcing any Interest against Buyer, its successors or assigns, assets, or properties; (iv) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due Buyer or its successors or assigns; (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of the Court, or the agreements or actions contemplated or taken in respect thereof; or (vi) revoking, terminating, or failing or refusing to renew any license, permit, or authorization to operate any of the Purchased Assets or conduct any of the businesses operated with the Purchased Assets.

25.      Except for the Assumed Liabilities expressly set forth in the APA, Buyer shall not have any liability or other obligation of the Debtor arising under or related to any of the

Purchased Assets.  Without limiting the generality of the foregoing, and except for Assumed Liabilities under the APA, Buyer shall not be liable for any claims against the Debtor or any of its predecessors or affiliates, and Buyer shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, any theory of antitrust, environmental, successor or transferee liability, labor law, de facto merger, or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, with respect to the Debtor or any obligations of the Debtor arising prior to the Closing Date, including, but not limited to, liabilities on account of any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of any of the Purchased Assets prior to the Closing.  Buyer has given substantial consideration under the APA for the benefit of the holders of any Interests.  The consideration given by Buyer shall constitute valid and valuable consideration for the releases of any potential claims of successor liability of Buyer, which releases shall be deemed to have been given in favor of Buyer by all holders of Interests against or in the Debtor or any of the Purchased Assets.

26.    The transactions contemplated by the APA are undertaken by Buyer without collusion and in good faith, as that term is used in § 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of the Sale (including the assumption and assignment of the Assigned Contracts), unless such authorization and such Sale are duly stayed pending such appeal.  Buyer is a good faith buyer within the meaning of § 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of § 363(m) of the Bankruptcy Code.

27.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (i) this Bankruptcy Case, (ii) any subsequent chapter 7 case into which the Bankruptcy Case may be converted, or (iii) any related proceeding subsequent to entry of this Order, shall conflict with or derogate from the provisions of the APA or the terms of this Order.

28.     Pursuant to Bankruptcy Rules 7062, 9014, 6004(h), and 6006(d), this Order shall be effective immediately and the stays provided under Bankruptcy Rules 6004(h) and 6006(d) are hereby terminated upon entry, and the Debtor and Buyer are authorized to close the Sale and effectuate the assumption and assignment of the Assigned Contracts immediately upon entry of this Order.

29.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale.

30.     Except for Bayshore, there are no brokers involved in consummating the Sale and no brokers' commissions are due.

31.     The failure specifically to include any particular provision of the APA in this Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety; provided, however, that any Permitted Liens (as such term is defined in the APA), that as a matter of law can be extinguished against or otherwise released from an asset sold under § 363 (or its related provisions) of the Bankruptcy Code, shall be fully extinguished or released upon Closing and shall attach to the Sale Proceeds or the assets of the Debtor's estate, as the case may be, in the same order and priority as they existed prior to the entry of this Order.

32.     The APA and any related agreements, documents or other instruments may be modified, amended or supplemented by the parties thereto and in accordance with the terms

thereof, without further order of the Court, provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor's estate.

33.    In accordance with Section 9.10 of the APA, the Buyer is authorized to assign, convey, transfer or otherwise dispose of all or any portion of its interest in, or its rights and obligations under, the APA to its Affiliates.  Buyer has designated its Affiliate Hardee Wauchula Farms, LLC as the grantee of the Owned Real Property and Seller shall deliver the deeds required pursuant to Section 2.4(b)(iv) of the APA to Hardee Wauchula Farms, LLC as the grantee thereunder.

34.    The Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the APA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith to which the Debtors are a party or which have been assigned by the Debtor to Buyer, and to adjudicate, if necessary, any and all disputes concerning or relating in any way to the Sale.   The Committee or any counterparty to an Assumed Liability shall have standing to seek relief pursuant to this Order or the APA.

35.    BFN has agreed to serve as the Back-Up Bidder.

36.    All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

37.     To the extent that this Order is inconsistent with any prior order or pleading with respect to the Sale Motion in the Bankruptcy Case, the terms of this Order shall govern.

# # #

**Submitted by:**
Luis Salazar, Esq. and Linda Jackson, Esq.
INFANTE, ZUMPANO, HUDSON & MILOCH, LLC
500 South Dixie Highway, Suite 302
Coral Gables, FL  33146
Phone:  (305) 503-2990; Fax:  (305) 774-5908
Email:  Luis.Salazar@izhmlaw.com
Email:  Linda.Jackson@izhmlaw.com

**Copies to:**
Luis Salazar, Esq.
*(Attorney Salazar shall serve a copy of this Order upon all interested parties upon receipt and file a certificate of service.)*

## EXHIBIT A

**APA**

**ASSET PURCHASE AGREEMENT**

**BY AND BETWEEN**

**FIRST FOLIAGE, L.C.**

as the Seller

**AND**

**COSTA FARMS, LLC**

as the Buyer

**FEBRUARY 9, 2011**

3382744-1

**TABLE OF CONTENTS**

**Page**

**ARTICLE I. DEFINITIONS** .................................................................**4**
    1.1    Certain Definitions.................................................................4
    1.2    Knowledge.......................................................................12
    1.3    Interpretation....................................................................12

**ARTICLE II. PURCHASE OF ASSETS**..................................................**12**
    2.1    Purchase ..........................................................................12
    2.2    Allocation of Purchase Price.................................................13
    2.3    Closing ...........................................................................14
    2.4    Closing Deliveries..............................................................14
    2.5    Assignment and Assumption of Contracts................................15
    2.6    Retained Liabilities............................................................15
    2.7    The Seller's Chapter 11 Bankruptcy Case ..............................16

**ARTICLE III. REPRESENTATIONS AND WARRANTIES OF SELLER**..........**16**
    3.1    Organization, Standing and Power ........................................16
    3.2    Authority.........................................................................16
    3.3    No Conflict......................................................................17
    3.4    Title...............................................................................17
    3.5    Assumed Contracts ...........................................................17
    3.6    Employee and Related Matters .............................................17
    3.7    Brokers ...........................................................................18

**ARTICLE IV. REPRESENTATIONS AND WARRANTIES OF BUYER**...........**18**
    4.1    Organization, Standing and Power ........................................18
    4.2    Authority.........................................................................18
    4.3    Consents and Approvals; No Violation...................................18
    4.4    Actions and Proceedings.....................................................19
    4.5    Brokers ...........................................................................19
    4.6    Financing.........................................................................19
    4.7    **AS IS SALE** ...................................................................19

**ARTICLE V. COVENANTS** .............................................................**19**
    5.1    Access............................................................................19
    5.2    Operation of Business.........................................................19
    5.3    Notification......................................................................21
    5.4    All Reasonable Efforts .......................................................21
    5.5    Further Assurances............................................................21
    5.6    Publicity.........................................................................21
    5.7    Confidentiality..................................................................22
    5.8    Transaction Taxes.............................................................22
    5.9    Notice of Nonsatisfaction of Closing Condition........................22
    5.10   Cooperation......................................................................22

i

5.11    Access to Records ........................................................................22
5.12    Notice of Sale ..............................................................................22

**ARTICLE VI. EMPLOYEE MATTERS** ................................................**23**
6.1     Personnel; Transferred Employees ...............................................23
6.2     COBRA and Health Claim Data ...................................................23
6.3     WARN ...........................................................................................23
6.4     Welfare Benefits ..........................................................................23
6.5     Vacations ......................................................................................24
6.6     Employee Benefit Plans – Seller's Liability ................................24
6.7     Wage Reporting ...........................................................................24
6.8     Unemployment Compensation ......................................................24
6.9     Employee Rights ..........................................................................24
6.10    Prior Service Recognized .............................................................24

**ARTICLE VII. CONDITIONS TO THE OBLIGATIONS OF THE PARTIES** ...................**25**
7.1     Conditions to Each Party's Obligations .......................................25
7.2     Conditions to Obligations of the Buyer ........................................25
7.3     Conditions to Obligations of the Seller ........................................26

**ARTICLE VIII. TERMINATION** ........................................................**26**
8.1     Termination ..................................................................................26
8.2     Procedure and Effect of Termination ...........................................28
8.3     Buyer's Exclusive Remedy ..........................................................28
8.4     The Seller's Remedy ....................................................................28

**ARTICLE IX. GENERAL PROVISIONS** .............................................**29**
9.1     Survival of Representations and Warranties .................................29
9.2     Notices .........................................................................................29
9.3     Section and Other Headings .........................................................30
9.4     Waiver ..........................................................................................30
9.5     Entire Agreement; Disclosure Schedules .....................................30
9.6     Amendments, Supplements, Etc ...................................................30
9.7     No Rights of Third Parties ...........................................................30
9.8     Enforcement .................................................................................30
9.9     Invalid Provisions ........................................................................30
9.10    Successors and Assigns ................................................................30
9.11    Counterparts .................................................................................31
9.12    Facsimile Signature .....................................................................31
9.13    Further Assurances ......................................................................31
9.14    Fees and Expenses .......................................................................31
9.15    WAIVER OF JURY TRIAL .........................................................31
9.16    Exclusive Jurisdiction .................................................................31
9.17    Computation of Days ...................................................................31
9.18    No Consequential or Punitive Damages .......................................32
9.19    Time of Essence ..........................................................................32

## Exhibits and Schedules

**Exhibits**

| | |
|---|---|
| A | Form of Assignment and Assumption Agreement for Assumed Contracts |
| B | Form of Assignment and Assumption Agreement for Real Property Leases |
| C | Form of Assignment for Intellectual Property |
| D | Form of Assumption Agreement for Assumed Liabilities |
| E | Omitted |
| F | Omitted |
| G | Form of Bill of Sale for Purchased Assets |
| H | Omitted |
| I | Form of Sale Order |
| J | Form of Escrow Agreement |

**Schedules**

| | |
|---|---|
| 1.1(a)(i) | Accounts Payable – Certain Post-Petition Accounts |
| 1.1(a)(ii) | Accounts Payable – Certain Pre-Petition Accounts |
| 1.1(b) | Real Property Leases |
| 1.1(c) | Assumed Contracts |
| 1.1(d)(i) | Certain Assumed Liabilities – Payroll |
| 1.1(d)(ii) | Certain Assumed Liabilities – Sales Allowances |
| 1.1(d)(iii) | Certain Assumed Liabilities – Cure Costs |
| 1.1(e) | Excluded Contracts |
| 1.1(f) | Owned Real Property |
| 1.5 | Permitted Liens |
| (b) | Asset Allocation |
| (d) | Title |

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement") dated February 9, 2011 (the "Execution Date"), is entered into by and between First Foliage, L.C., a Florida limited liability company (the "Seller"), and Costa Farms, LLC, a Florida limited liability company (the "Buyer").  Capitalized terms used herein not otherwise defined have the meanings set forth in Section 2(a).

## RECITALS

WHEREAS, the Seller desires to sell, and the Buyer desires to buy, the Purchased Assets;

WHEREAS, the Seller is a debtor in that certain case, File No. 10-27532-LMI (the "Bankruptcy Case") in the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") pursuant to Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code");

WHEREAS, the Seller has been soliciting bids for the Purchased Assets, and has determined that the Buyer's offer for the Purchased Assets set forth below is the highest and best offer received for those Purchased Assets to date and constitutes a fair and adequate purchase price;

WHEREAS, the sole member of the Buyer has determined that it is in the best interest of the Buyer to acquire the Purchased Assets;

WHEREAS, the parties hereto have agreed that, subject to the terms and conditions of this Agreement, the Seller will sell, and the Buyer will acquire, the Purchased Assets free and clear of all Liens, Claims, and Indebtedness under Sections 363(f) and 365 of the Bankruptcy Code;

WHEREAS, the Seller has determined that it is in the best interest of the Seller and its estate that the Seller sell all of its assets used in connection with the Business and the goodwill of the Business and, in furtherance thereof, has approved this Agreement and the transactions contemplated hereby;

NOW, THEREFORE, in consideration of the mutual promises, covenants and conditions set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties have agreed as follows:

## 2.
## DEFINITIONS

(a)    Certain Definitions.  For purposes of this Agreement, the following terms shall have the meanings set forth below:

"*Accounts Payable*" shall mean the trade accounts payable of the Seller incurred in the ordinary course of business (a) after the Petition Date and not more than thirty (30) days past due, up to an aggregate of $200,000, (b) after the Petition Date and not more than sixty (60) days past due, up to $87,000 and to the extent specifically set forth on Schedule 1.1(a)(i), and (c) prior to the Petition Date in amounts up to an aggregate of $500,000 (but only to the extent specifically set forth on Schedule 1.1(a)(ii) hereto, as amended by the Buyer as of the Closing Date), which aggregate amount in (c) shall only include, and be allocated pro rata among, vendors that have executed agreements with, and satisfactory to, the Buyer providing, among other things, that (i) such vendor will extend customary credit terms and conditions to the Buyer

4

after the Closing (regardless of whether the Buyer utilizes such credit terms and conditions), (ii) such vendor releases (without any additional consideration therefor) all of the Seller's directors, officers, and members from all personal guarantees executed, and Liens granted, for the benefit of the Seller by such directors, officers or members in favor of such vendor, and (iii) the Buyer shall pay such vendor's pro rata portion of the $500,000 or such lesser amount, in equal monthly installments over the six (6) months following the Closing; provided, however, that in the event the Official Committee of Unsecured Creditors agrees and affirmatively supports that, under the terms and conditions of the Bidding Procedures, (i) the Buyer is a Qualified Bidder (as defined in the Bidding Procedures), (ii) this Agreement is a Qualified Bid (as defined in the Bidding Procedures), and (iii) the Buyer is not otherwise disqualified or to be excluded from participating in the Auction, all references to "$500,000" contained in this definition of Accounts Payable shall be increased to $1,000,000.

"*Accounts Receivable*" means all of the trade notes or accounts receivable arising out of Inventory sold or shipped or services performed in connection with the operation of, or relating to, the Business.

"*Affiliate*" or "*Affiliates*" shall mean with respect to a specified Person, another Person that, either directly or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the Person specified.

"*Agreement*" has the meaning set forth in the Recitals to this Agreement.

"*Alternative Agreement*" shall mean one or more definitive agreements with respect to one or more Alternative Transactions.

"*Alternative Transaction*" shall mean any agreement or arrangement, or agreement to support or propose to the Bankruptcy Court any agreement or arrangement, in connection with any asset sale, stock sale, merger, debt for equity swap, joint venture, financing, reorganization, recapitalization or transfer (including the filing of a plan of reorganization with the Bankruptcy Court) of any convertible debt, convertible equity or warrants the effect of which, individually or in the aggregate, is the direct or indirect transfer of a material portion of the Purchased Assets or the direct or indirect transfer of the ability to effectuate a change of control of the ownership of all or substantial portion of the Purchased Assets, or any similar transaction that does not involve, or delays or deters, a sale of the Purchased Assets to the Buyer.

"*Ancillary Documents*" has the meaning set forth in Section 3(d)(ii)(I).

"*Applicable Law(s)*" shall mean any federal, state, provincial, territorial, local or foreign laws, including common law, Orders, writs, injunctions, decrees, codes, guidelines, policies, ordinances, awards, stipulations, judgments, directions, requirements, statutes, judicial or administrative doctrines, rules or regulations enacted, promulgated, issued or entered by a Governmental Authority, including the Bankruptcy Code and the Code, to which a specified Person or property is subject.

"*Asset Allocation*" has the meaning set forth in Section 3(b).

"*Assignment and Assumption Agreement for Assumed Contracts*" shall mean an instrument substantially in the form attached hereto as Exhibit A, assigning the Assumed Contracts, other than Real Property Leases, to the Buyer.

5

"*Assignment and Assumption Agreement for Real Property Leases*" shall mean an instrument substantially in the form attached hereto as Exhibit B, assigning the Real Property Leases for the properties set forth on Schedule 1.1(b), to the Buyer.

"*Assignment for Intellectual Property*" shall mean an instrument substantially in the form attached hereto as Exhibit C, assigning the Intellectual Property to the Buyer.

"*Assumed Contracts*" shall mean (i) all Contracts between the Seller and its customers relating to the purchase of the Seller's products and/or services, including, retailer and supplier agreements, (ii) all Contracts relating to Intellectual Property or internet domain names, and (iii) all capital leases for equipment and other personal property of the Seller, in each case , only as set forth on Schedule 1.1(c) and to the extent agreed to by the Buyer in writing after delivery of Schedule 1.1(c) to the Buyer.

"*Assumed Liabilities*" shall mean the following liabilities and obligations of the Seller: (i) all liabilities and obligations arising with respect to periods commencing after the Closing Date under or pursuant to any Assumed Contracts and which relate to the performance of the Assumed Contracts on and after the Closing Date (other than any obligations or liabilities that are the result of the breach of any Assumed Contract prior to or on the Closing Date), (ii) all liabilities and obligations occurring, arising out of or related to the ownership and operation of the Business and the Purchased Assets after the Closing Date, (iii) up to two weeks of all accrued, but unpaid wages of the Transferred Employees that are paid semi-monthly pursuant to the Seller's standard payroll, together with the corresponding payroll taxes, to the extent set forth on Schedule 1.1(d)(i) and to the extent agreed to by the Buyer in writing after delivery of Schedule 1.1(d)(i) to the Buyer, (iv) the Accounts Payable, (v) liabilities to customers under the Seller's general ledger accounts "Accrued Liabilities – Cooperative Advertising", "Accrued Liabilities –Merchandising", and "Accrued Liabilities – New Store Allowance" to the extent set forth on Schedule 1.1(d)(ii) and to the extent agreed to by the Buyer in writing after delivery of Schedule 1.1(d)(ii) to the Buyer, (vi) the Seller's unpaid crop insurance premiums solely to the extent attributable to pre-Closing periods for the policy year beginning June 1, 2010 and ending May 31, 2011, in the approximate amount of $287,000, and (vi) the Cure Costs set forth on Schedule 1.1(d)(iii) up to $30,000 and to the extent agreed to by the Buyer in writing after delivery of Schedule 1.1(d)(iii) to the Buyer.

"*Assumption Agreement for Assumed Liabilities*" shall mean an instrument substantially in the form attached hereto as Exhibit D, pursuant to which the Buyer will assume and agree to pay and discharge the Assumed Liabilities in accordance with the Sale Order.

"*Auction*" means the auction of the Purchased Assets as provided for under the Bidding Procedures Order.

"*Avoidance Actions*" means any and all actions which a trustee, debtor in possession or other appropriate party in interest may assert on behalf of the Estate under applicable state statute or Chapter 5 of the Bankruptcy Code, including actions under one or more provisions of sections 542, 543, 544, 545, 546, 547, 548, 549, 550, 551, and 553.

"*Bankruptcy Case*" has the meaning set forth in the recitals of this Agreement.

"*Bankruptcy Code*" has the meaning set forth in the recitals of this Agreement.

"*Bankruptcy Court*" has the meaning set forth in the recitals of this Agreement.

6

"*Bidding Procedures*" means the bidding procedures approved by the Bankruptcy Court pursuant to the Bidding Procedures Order.

"*Bidding Procedures Order*" means the order of the Bankruptcy Court entered on January 14, 2011 that approved, *inter alia*, bidding and Auction procedures to be followed by the Seller and all potential bidders for the Purchased Assets.

"*Bill of Sale for Purchased Assets*" shall mean an instrument substantially in the form attached hereto as <u>Exhibit G</u>, assigning, conveying and transferring the Purchased Assets (other than the Assumed Contracts and the Real Property) to the Buyer.

"*Books and Records*" shall mean all business records, books, files, ledgers, documents and correspondence owned and controlled by the Seller, confidential and otherwise, in whatever form, wherever located, which relate to the Seller, the Business, the Purchased Assets or the Transferred Employees or their dependents or beneficiaries (subject, in the case of Transferred Employees or their dependents or beneficiaries, to the obtaining of any consents required from any third party), including market information, sales aids, customer and supplier lists, files, records and data; written medical records, medical surveillance samples, capital expenditure plans and studies; emergency studies; maintenance and repair reports; accounting, real property, environmental, tax, health, safety, toxicology and hygiene records; plans and designs for capital and cost reduction projects, but excluding the Excluded Books and Records.

"*Business*" shall mean all business now or heretofore conducted by the Seller relating to the growth and distribution of container grown plants to retail and commercial customers.

"*Business Day*" shall mean any date, other than a Saturday, Sunday or any other day on which national banks are required or authorized by law to close in Miami, Florida.

"*Buyer*" has the meaning set forth in the recitals to this Agreement.

"*Capital Stock*" means, with respect to: (i) any corporation, any share, or any depositary receipt or other certificate representing any share, of an equity ownership interest in the corporation; and (ii) any other Entity, any share, membership or other percentage interest, unit of participation or other equivalent (however designated) of an equity interest in the Entity.

"*Cash*" shall mean all cash on the Seller's books as of the Closing, taking into account all outstanding checks, deposits in transit, outstanding bank fees and other items required to be reconciled under United States generally accepted accounting principles.

"*Cash Purchase Price*" shall have the meaning set forth in Section 3(a)(ii).

"*Charter Documents*" means, with respect to any Entity at any time, in each case as amended, modified and supplemented at that time, (i) the articles or certificate of formation, incorporation or organization (or the equivalent organizational documents) of the Entity, (ii) the bylaws or limited liability company agreement or regulations (or the equivalent governing documents) of the Entity, and (iii) each document setting forth the designation, amount and relative rights, limitations and preferences of any class or series of the Entity's Capital Stock or of any rights in respect of the Entity's Capital Stock.

"*Claim*" means a claim against the Seller or their respective property, as such term is defined in section 101(5) of the Bankruptcy Code.

"*Closing*" shall mean the consummation of the purchase and sale of the Purchased Assets and the assumption of the Assumed Liabilities, in each case in accordance with the terms and provisions of this Agreement.

"*Closing Date*" shall mean the first Business Day following the satisfaction or waiver by the party entitled to do so of the conditions in Article VII; provided, however, that in the event the Buyer has used its commercially reasonable efforts to consummate the Closing by such date but the Closing has not yet occurred, the Closing Date shall be extended to a date not later than February 15, 2011; and provided, further, that in no event shall the Closing Date be a date later than February 15, 2011 without the written consent of the Buyer, the Seller and Bank of America, N.A.

"*Closing Payment*" has the meaning set forth in Section 3(a)(iv).

"*COBRA*" has the meaning set forth in Section 7(b).

"*Code*" shall mean the Internal Revenue Code of 1986, as amended (or the applicable provisions of any succeeding statute).

"*Commonly Controlled Entity*" means employers (whether or not incorporated) that would be treated together with the Seller as a single employer (i) within the meaning of Section 414 of the Code or (ii) as a result of the Seller being or having been a general partner of any such employer.

"*Contract*" shall mean any agreement, arrangement, contract, lease, purchase order, sale order or commitment or other binding arrangement or understanding, whether written or oral.

"*Cure Costs*" has the meaning set forth in Section 3(e)(ii).

"*Deposit*" has the meaning set forth in Section 3(a)(ii).

"*Employee*" shall mean an employee of the Seller, including inactive employees and employees on leave.

"*Employee Benefit Plan(s)*" shall mean any employee benefit plan (as defined in Section 3(3) of ERISA) or material fringe benefit plan maintained or contributed to or required to be contributed to by the Seller.

"*Entity*" shall mean any sole proprietorship, corporation, partnership of any kind having a separate legal status, limited liability company, business trust, unincorporated organization or association, mutual company, joint stock company or joint venture.

"*Equipment*" shall mean all machinery and equipment, spare parts, furniture, office equipment, computer equipment and hardware, fittings, tools, apparatus, signage, maintenance equipment, vehicles and rolling stock and other personal property of any kind or type that is used or held for use in connection with Business.

"*ERISA*" shall mean the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations thereunder.

"*Escrow Agent*" has the meaning set forth in Section 3(a)(ii).

"*Escrow Agreement*" has the meaning set forth in Section 3(a)(ii).

"*Estate*" means the Seller's estate created pursuant to section 541 of the Bankruptcy Code.

"*Excluded Assets*" shall mean (i) any Contract that is not an Assumed Contract or Postpetition Contract, (ii) any Avoidance Actions (other than against Transferred Employees), (iii) the right to the Purchase Price and other rights granted to the Seller under this Agreement, (iv) all rights and claims in or to any refunds or credits of or with respect to any Taxes, assessments or similar charges paid by or on behalf of the Seller, in each case to the extent applicable to any period prior to the Closing Date (but not any of the foregoing paid by the Buyer), (v) the Excluded Books and Records, (vi) all Cash, (vii) professional retainers paid by the Seller, (viii) any intercompany receivable or other amount owed to any Seller by any Affiliate of the Seller, (ix) any amounts that have been placed into escrow accounts for the benefit of professionals, (x) all refunds, deposits, prepayments and prepaid expenses relating to any Retained Liabilities, (xi) the Capital Stock of the Seller and any other Person, and (xii) claims asserted or that could have been asserted by or on behalf of the Seller in the case styled First Foliage v. Insurance for Agriculture, LLC, et al. Adv. Pro. 10-03591-LMI.

"*Excluded Books and Records*" shall mean (i) any Tax Returns, and (ii) any books and records of whatever type relating to the Seller as an Entity, including stock records and minute books.

"*Excluded Contracts*" shall mean each Contract set forth on <u>Schedule 1.1(e)</u> as agreed to by the Buyer after delivery of <u>Schedule 1.1(e)</u> to the Buyer.

"*Execution Date*" has the meaning set forth in the opening paragraph of this Agreement.

"*Final Order*" shall mean an order of the Bankruptcy Court that (i) has not been stayed by the Bankruptcy Court or other court of competent jurisdiction and (ii) complies with the conditions described in <u>Section 7.1(b)</u> and <u>Section 7.2(d)</u> hereof.

"*GAAP*" shall mean generally accepted accounting principles in the United States, consistent with the Seller's past practices.

"*Governmental Approvals*" shall mean those approvals, authorizations, confirmations, consents, exemptions and orders from Governmental Authorities and the making of all necessary registrations and filings (including filings with Governmental Authorities) and the taking of all reasonable steps as may be necessary to obtain an approval or waiver from, or to avoid an action or proceeding to prevent the Closing by, any Governmental Authority, which are required to be obtained or taken to consummate the transactions contemplated herein under Applicable Laws.

"*Governmental Authority*" shall mean any national, federal, state, provincial, local or foreign government, or any subdivision, agency, instrumentality, authority, department, commission, board or bureau thereof, or any federal, state, provincial, local or foreign court, tribunal, or arbitrator, including the Bankruptcy Court.

"*Indebtedness*" with respect to any Person shall mean any obligation of such Person for borrowed money, but in any event shall include:  (i) any obligation or liabilities incurred for all or any part of the purchase price of property or other assets or for the cost of property or other assets constructed or of improvements thereto, other than accounts payable included in current liabilities and incurred in respect of property purchased in the ordinary course of business (whether such Person has assumed or become liable for the payment of such obligation) (whether accrued, absolute, contingent, unliquidated or otherwise, known or unknown, whether due or to become due) whether or not secured by a Lien; (ii) the face amount of all letters of credit issued for the account of such Person and all unpaid drafts drawn thereunder; (iii) capitalized lease

obligations; and (iv) all guarantees of such Person of obligations of other Persons of the type referred to in clauses (i) through (iii) above.

"*Intellectual Property*" shall mean the Intellectual Property Rights owned or used by the Seller that are used in, or held for use in, the Business.

"*Intellectual Property Rights*" shall mean all intellectual property rights, including both statutory and common law rights, throughout the world, as applicable, in or to any (i) patents, patent applications and invention disclosure, (ii) copyrights, registrations, renewals and applications for registrations thereof, (iii) trade secrets, know-how and confidential information, or (iv) trademarks, trade names, service marks, trade dress, product configurations, slogans, logos and any applications and registrations therefor.

"*Inventory*" shall mean (i) all inventories of the Seller, including all unfinished and finished goods, samples, and labels, cartons and packaging materials that are used in connection with, are held for use solely in, or otherwise relate solely to, the operations of the Business and (ii) all raw materials, work-in-process of the Seller that are used in connection with, are held for use solely in, or otherwise relate solely to, the Business.

"*Leased Real Property*" shall mean all of the Seller's leases of real property, all of such Leased Real Property being set forth on Schedule 1.1(b).

"*Lien(s)*" shall mean any (i) security interest, lien, mortgage, pledge, hypothecation, encumbrance, Claim, easement, charge, restriction on transfer or otherwise, or interest of another Person of any kind or nature, including any conditional sale or other title retention Contract or lease in the nature thereof; (ii) any filing or agreement to file a financing statement as debtor under the applicable Uniform Commercial Code or any similar statute; and (iii) any subordination arrangement in favor of another Person.

"*Material Adverse Effect*" shall mean any event, change, condition, or matter that individually or in the aggregate results in or could reasonably be expected to result in a material adverse effect or change in the result of operations, properties, assets or condition (financial or otherwise) of the Purchased Assets and the Business in the aggregate or the Purchased Assets taken as a whole, excluding any event, change, condition, or matter (i) resulting from the filing of the Bankruptcy Case or (ii) that affects generally the Business and that does not disproportionately affect the Seller.

"*Material Contract*" shall mean any Contract requiring (or anticipated to require) payments by the Seller, or resulting in (or anticipated to result in) receipts by the Seller of amounts, in excess of $50,000 during calendar year 2010.

"*Notice*" has the meaning set forth in Section 10(b).

"*Order*" shall mean any writ, judgment, decree, injunction or similar order, writ, ruling directive or other requirement of any Governmental Authority (in each such case whether preliminary or final).

"*Owned Real Property*" means all of the real property owned by the Seller, all of such Owned Real Property being set forth on Schedule 1.1(f).

"*Permitted Liens*" shall mean only the Liens specified on Schedule 1.5, but only to the extent agreed to in writing by the Buyer after delivery of Schedule 1.5 to the Buyer.

10

"*Person*" or "*Persons*" shall mean any individual, company, corporation, association, partnership, limited liability company, firm, joint venture, trust, Governmental Authority, or other entity.

"*Petition Date*" shall mean June 23, 2010.

"*Professional Fees*" shall mean a Claim by any Person employed or to be compensated pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code for compensation and/or reimbursement of expenses pursuant to sections 327, 328, 330, 331, 503(b) or 1103 of the Bankruptcy Code in connection with an application made to the Bankruptcy Court in the Bankruptcy Case.

"*Purchase Price*" has the meaning set forth in Section 3(a)(ii).

"*Purchased Assets*" shall mean any and all assets and rights of the Seller that are used in or held for use in the Business, other than the Excluded Assets, including the following:

      (a)      Inventory;

      (b)      Accounts Receivable;

      (c)      Real Property;

      (d)      Equipment;

      (e)      all rights under Assumed Contracts and Postpetition Contracts;

      (f)      all Intellectual Property Rights owned or used by the Seller;

      (g)      all goodwill relating to the Business;

      (h)      all refunds, deposits, prepayments and prepaid expenses relating to any Assumed Contracts;

      (i)      all claims, causes of action, choses in action, rights of recovery or setoff of any kind against any Person who holds an Assumed Liability;

      (j)      all claims, causes of action, choses in action, rights of recovery or setoff of any kind against any Person that has provided insurance to the Seller; and

      (k)      all Books and Records.

"*Qualified Bid*" has the meaning set forth in the Bidding Procedures.

"Postpetition Contracts" shall mean (i) all confidentiality agreements between the Seller or its representatives and any other Person, (ii) all Contracts with banks and other financial institutions with respect to the Seller's depositary and operating bank accounts,

"*Real Property*" shall mean the Leased Real Property and the Owned Real Property.

"*Real Property Lease(s)*" shall mean any lease or sublease of Leased Real Property.

"*Representatives*" shall mean, with respect to any Person, the officers, directors, employees, attorneys, investment bankers, accountants and other agents and representatives of such Person.

"*Retained Liabilities*" has the meaning set forth in Section 3(f).

"*Sale Order*" shall mean an order of the Bankruptcy Court in substance in the form of <u>Exhibit I</u> (with such changes as agreed to by the Buyer in its reasonable discretion).

"*Seller*" has the meaning set forth in the opening paragraph to this Agreement.

"*Tax*" or "*Taxes*" shall mean all federal, state, local, foreign or provincial taxes, charges, fees, duties, levies or other assessments, including income, gross receipts, Capital Stock, net proceeds, ad valorem, turnover, real, personal and other property (tangible and intangible), sales, use, franchise, excise, value added, stamp, leasing, lease, user, transfer, fuel, excess profits, occupational, interest equalization, windfall profits, unitary, severance and employees' income withholding, unemployment and Social Security taxes, duties, assessments and charges (including the recapture of any tax items such as investment tax credits), which are imposed by the United States, or any Governmental Authority, including any interest, penalties or additions to tax related thereto imposed by any Governmental Authority (including any interest or penalties with respect to such Taxes).

"*Tax Return(s)*" shall mean all reports, estimates, declarations of estimated tax, information statements and returns relating to, or required to be filed in connection with, any Taxes, including information returns or reports with respect to backup withholding and other payments to third parties.

"*Transaction Taxes*" has the meaning set forth in Section 6(h).

"*Transferred Employees*" has the meaning set forth in Section 7(a).

"*UST*" has the meaning set forth in Section 6(b).

"*WARN*" has the meaning set forth in Section 7(c).

"*Winning Bidder*" has the meaning set forth in the Bidding Procedures Order.

Other Terms.  Other terms may be defined elsewhere in this Agreement and, unless otherwise indicated, shall be used throughout this Agreement as so defined.

(b)    Knowledge.   For the purposes of this Agreement, unless expressly provided otherwise, any reference to "knowledge of the Seller" or any similar expression shall be deemed to mean and include the knowledge of any of the following officers of the Seller: Jose Garces, Chief Executive Officer; Beatriz Garces, Executive Vice President Sales and Marketing; and Guillermo Navarro, Chief Financial Officer, and Karen Dreyer, after reasonable due inquiry.

(c)    Interpretation.  Whenever the words "include," "includes" or "including" are used in this Agreement, they shall be deemed to be followed by the words "without limitation".  The words "hereof," "herein" and "hereunder" and words of similar import when used in this Agreement shall refer to this Agreement as a whole and not to any particular provision of this Agreement.  The definitions contained in this Agreement are applicable to the singular as well as the plural forms of such terms and to the masculine as well as to the feminine and neuter genders of such terms.

3.
PURCHASE OF ASSETS

(a)    Purchase.

(i)    *Purchase*.  Subject to the satisfaction of the conditions contained in this Agreement, on the Closing Date, the Seller shall sell, transfer, assign, convey, and deliver to the

12

Buyer, free and clear of all Claims and Liens, except Assumed Liabilities, as contemplated by Section 363 of the Bankruptcy Code, and the Buyer, or one or more Affiliates thereof as specified by Buyer, shall purchase and accept, all right, title and interest of the Seller in and to the Purchased Assets.

(ii)    *Purchase Price*.  The purchase price for the Purchased Assets shall be an aggregate amount equal to (i) (A) $19.9 million <u>minus</u> (B) unpaid property taxes related to the Owned Real Property that are attributable to pre-Closing periods, <u>minus</u> (C) the pre-Closing portion of accrued and unpaid premiums for the Seller's crop insurance for the policy year beginning June 1, 2010 and ending May 31, 2011, to the extent such unpaid portion exceeds $70,000 (collectively, the "<u>Cash Purchase Price</u>"), <u>plus</u> (ii) the Assumed Liabilities (together with the Cash Purchase Price, the "<u>Purchase Price</u>").

(iii)    *Deposit*.  By no later than close of business on February 8, 2011, the Buyer shall deliver a deposit in the amount of $19,900,000 (the "Deposit") to Seller's counsel, Infante, Zumpano, Hudson & Miloch, LLC, who shall act as escrow agent (the "<u>Escrow Agent</u>") and hold the Deposit pursuant to an escrow agreement in substantially the form of <u>Exhibit J</u> attached hereto (the "<u>Escrow Agreement</u>") provided, however, that if the Sale Order has not been entered by February 9, 2011, the Seller shall direct the Escrow Agent to return all but $1,350,000 of the Deposit to the Buyer on February 10, 2011, and retain such $1,350,000 as the Deposit for purposes of this AgreementThe Escrow Agent shall hold the Deposit subject to the jurisdiction of the Bankruptcy Court.  The Deposit shall be (i) applied to the Closing Payment as provided in Section 3(a)(iv) if the Closing occurs, or (ii) distributed pursuant to the provisions of Sections (c) or (d) if the Closing does not occur.    The Seller confirms that the Deposit was received by the Escrow Agent on February 8, 2011.

(iv)    *Closing Payment*.  At Closing, the Buyer (i) shall pay to the Seller for the Purchased Assets hereunder, in immediately available funds, an amount equal to the Cash Purchase Price minus the Deposit (the "<u>Closing Payment</u>") and (ii) shall cause the Escrow Agent to transfer the Deposit to the Seller.

(v)    *Assumption of Liabilities*.  At Closing, as additional consideration to the Seller for the sale of the Purchased Assets, the Buyer shall assume, and agree to pay, perform, fulfill and discharge, the Assumed Liabilities.

(b)    <u>Allocation of Purchase Price</u>.  The Buyer and the Seller agree to allocate the Purchase Price (together with any Assumed Liabilities) for the Purchased Assets as set forth on <u>Schedule (b)</u> (the "<u>Asset Allocation</u>").  The Asset Allocation shall be completed in the manner required by Section 1060 of the Code and the applicable Treasury Regulations promulgated thereunder.  The Buyer and the Seller further agree to comply with all filing, notice and reporting requirements described in Section 1060 of the Code and the applicable Treasury Regulations promulgated thereunder, including the timely preparation and filing of Form 8594 based on the Asset Allocation.  The Buyer and the Seller hereby agree that they will report the federal, state, foreign and other Tax consequences of the transactions contemplated by this Agreement in a manner consistent with the Asset Allocation.

(c)    <u>Closing</u>.  The Closing shall occur on the Closing Date.  The Closing shall take place at the offices of Kozyak Tropin & Throckmorton, P.A. in Miami, Florida or at such other location as agreed to by the parties.

(d)    <u>Closing Deliveries</u>.

(i)    At the Closing, unless waived by the Seller, the Buyer shall deliver, cause to be delivered, or execute and deliver, as applicable, to the Seller:

(A)    the Assignment and Assumption Agreement for Assumed Contracts and Postpetition Contracts;

(B)    the Assignment and Assumption Agreement for Real Property Leases;

(C)    the Assumption Agreement for Assumed Liabilities;

(D)    the Assignment for Intellectual Property;

(E)    the Deposit;

(F)    the Closing Payment;

(G)    a certificate, dated as of the Closing Date, executed on behalf of the Buyer, that the conditions to Closing specified in Sections 8(a) and 8(c) have been satisfied or waived; and

(H)    all other documents, certificates, instruments or writings reasonably requested by the Seller in connection herewith.

(ii)    At the Closing, unless waived by the Buyer, the Seller shall deliver or cause to be delivered, or execute and deliver, as applicable, to the Buyer:

(A)    the Bill of Sale for the Purchased Assets;

(B)    the Assignment and Assumption Agreement for the Assumed Contracts and Postpetition Contracts;

(C)    the Assignment and Assumption Agreement for Real Property Leases;

(D)    the Assumption Agreement for Assumed Liabilities;

(E)    the Assignment for Intellectual Property;

(F)    the deed transferring the Owned Real Property, together with such surveys and title insurance as to convey clear title to the Owned Property, free of all Liens other than Permitted Liens;

14

(G)    a certificate, dated as of the Closing Date, executed on behalf of the Seller, certifying in such detail as the Buyer may reasonably request that the conditions to Closing specified in Sections 8(a) and 8(b) have been satisfied or waived;

(H)    a certified copy of the Sale Order, which order has not been reversed or modified on appeal or, if any such appeal is pending, such order shall not have been stayed; and

(I)    all other documents, certificates, instruments or writings reasonably requested by the Buyer in connection herewith, including all documents necessary to transfer all vehicles and other Purchased Assets to the Buyer (all the documents referred to in Sections 3(d)(i) and 3(d)(ii) being referred to as the "Ancillary Documents").

(e)    Assignment and Assumption of Contracts.

(i)    Subject to the Order of the Bankruptcy Court approving the assumption and assignment of executory Contracts pursuant to Section 365 of the Bankruptcy Code, the Assumed Contracts shall be assumed by the Seller and assigned to the Buyer or the Buyer's designee on the Closing Date under Section 365 of the Bankruptcy Code. The Seller shall, consistent with the Bankruptcy Case, promptly comply with and perform any obligations under the Assumed Contracts arising from and after the date hereof and through the Closing Date and shall pay the Cure Costs at or prior to the Closing Date. The Seller shall seek Bankruptcy Court authority to assign the Assumed Contracts to the Buyer (or the Buyer's designee) in accordance with Section 365 of the Bankruptcy Code. All Assumed Contracts and Postpetition Contracts shall be assigned to and assumed by the Buyer (or the Buyer's designee) at Closing.

(ii)    To the extent any amount is required to be paid to cure any defaults which exist as of the Closing Date with respect to any of the Assumed Contracts, the Seller shall cure such defaults at or prior to the Closing to the extent such cure is required by Section 365 of the Bankruptcy Code (any such amounts paid to cure any such defaults being referred to the "Cure Costs").

(f)    Retained Liabilities. The Seller shall retain the Retained Liabilities and the Buyer will not assume or otherwise be responsible at any time for any liability, obligation, Indebtedness, Contract or commitment of the Seller with respect to the Retained Liabilities. "Retained Liabilities" shall mean every liability of the Seller, whether known or unknown, whether absolute, contingent, liquidated or unliquidated, unaccrued, asserted, unasserted, or otherwise, and whether related to the Business, the Purchased Assets, the Excluded Assets or otherwise, other than the Assumed Liabilities, including:

(i)    any liabilities, obligations, debts or commitments of the Seller incident to, arising out of or incurred with respect to this Agreement and the transactions contemplated hereby, (i) which otherwise arise or are asserted or incurred by reason of events, acts or transactions occurring, or the operation of the Business, prior to or on the Closing Date, (ii)

15

relating to or arising under any Employee Benefit Plans, or (iii) which is in existence on or prior to the Closing Date and which relates to or arises under any environmental Applicable Law;

(ii)    all Taxes of the Seller, including those related to the Business or the Purchased Assets prior to the Closing Date and any and all Taxes arising out of the transactions contemplated hereby;

(iii)    all of the Seller's liabilities or obligations under the Employee Benefit Plans or relating to any Employees or former Employees, including without limitation, any wages, severance, bonuses, Claims, sick leave, unemployment benefits, workers' compensation claims, pension benefits, employee stock options or profit-sharing plans, health care plans on benefits or any other employee plans or benefits of any kind for the Employees or former Employees or both;

(iv)    all of the Seller's liabilities or obligations under any employment, severance, retention or termination Contract with any Employee;

(v)    all of the Seller's liabilities or obligations not expressly to be assumed by the Buyer at Closing hereunder;

(vi)    the accounts payable that arise before the Petition Date or that are not specifically included in Assumed Liabilities; and

(vii)    the Cure Costs in excess of $30,000.

(g)    The Seller's Chapter 11 Bankruptcy Case.  Notwithstanding any conflicting or inconsistent provisions of this Agreement, the Seller's obligations under this Agreement and the transactions contemplated hereby are subject to and contingent upon the approval and authorization of the Bankruptcy Court.

4.

REPRESENTATIONS AND WARRANTIES OF SELLER

The Seller hereby represents and warrants to the Buyer as of the Execution Date and, unless otherwise specifically provided in any representation or warranty, the Closing Date as follows:

(a)    Organization, Standing and Power.  The Seller is validly existing and in good standing under the laws of the jurisdiction of its organization and has full limited liability company power and authority to conduct its business in the places and in the manner now being conducted.  The Seller has full limited liability company power and authority to own and operate the Purchased Assets owned or operated by it.

(b)    Authority.  Subject to the approval of the Bankruptcy Court, the Seller has the requisite power and authority to execute and to deliver this Agreement and the Ancillary Documents to which it is or will be a party and to perform its obligations hereunder and under any such Ancillary Documents.  The execution and delivery by the Seller of this Agreement and the Ancillary Documents to which it is or will be a party, the performance of its obligations hereunder and thereunder and the consummation by them of the transactions contemplated

16

hereby and thereby have been duly authorized by all necessary limited liability company action on the part of the Seller, and no other limited liability company action on the part of the Seller is necessary to authorize the execution and delivery of this Agreement, the Ancillary Documents or the consummation of the transactions contemplated hereby or thereby.  Subject to the approval of the Bankruptcy Court, this Agreement has been duly and validly executed and delivered by the Seller and constitutes a valid and binding obligation of the Seller, enforceable against the Seller in accordance with its terms.  Subject to the approval of the Bankruptcy Court, each of the Ancillary Documents, when executed and delivered by the Seller, shall constitute a valid and binding agreement of the Seller, enforceable against the Seller, in accordance with its terms, subject to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(c)     No Conflict.    Subject to the approval of the Bankruptcy Court, neither the execution and delivery by the Seller of this Agreement and any Ancillary Document to which it will be a party, nor the consummation of the transactions contemplated hereby or thereby, will result in the creation of any Lien, Claim or Order upon the Purchased Assets or Assumed Liabilities (except as specifically contemplated by this Agreement), does or will conflict with, result in any violation of, or constitute a default under any provision of (a) the Seller's Charter Documents or (b) any Applicable Law.  The Seller has complied in all material respects with all Applicable Laws and Orders in connection with the execution, delivery and performance of this Agreement, the Ancillary Documents and the transactions contemplated hereby and thereby.

(d)     Title.    Except as set forth on Schedule (d) hereto, the Seller owns good and, subject to the Bankruptcy Case, transferable title to all of the Purchased Assets, free and clear of all Claims, Orders and Liens other than Liens to be released at or prior to Closing and Liens for Taxes that are not yet due and payable.

(e)     Assumed Contracts.    To the Seller's knowledge, except for defaults caused by the commencement of the Bankruptcy Case, each Assumed Contract is valid, binding upon the Seller and in full force and effect in all material respects, and no material default or event of default by the Seller or, to the Seller's knowledge, any other party thereto, exists under any of the Assumed Contracts.  To the Seller's knowledge, no party to any of the Assumed Contracts has given notice of default or termination.  The Seller has not made an assignment or transfer of any of its rights under any of the Assumed Contracts, except collateral assignments to secured lenders that are to be released at or prior to Closing.

(f)     Employee and Related Matters.    The Seller is not a party to any collective bargaining agreement covering the Employees and, since January 1, 2009, there have been no strikes, material work stoppages, nor to the knowledge of the Seller, any written demands for collective bargaining by any union, labor organization or other Person with respect to the Employees.  There are no unfair labor practice proceedings, discrimination or civil rights complaints pending or, to the Seller's knowledge, threatened in writing between the Seller and any of the current or former Employees or any labor or other collective bargaining unit representing any current or former Employee that would reasonably be expected to result in any liability.

17

(g)     Brokers.  Bayshore Partners, LLC, the Seller's exclusive financial advisor and investment banker, is the only intermediary / broker entitled to a fee at the Closing in connection with the transactions contemplated herein pursuant to an agreement entered into by the Seller and will be paid by the Seller from the proceeds of the sale in accordance with the terms of the Bankruptcy Court order employing Bayshore Partners, LLC.

5.

REPRESENTATIONS AND WARRANTIES OF BUYER

The Buyer represents and warrants to the Seller as of the Execution Date and the Closing Date:

(a)     Organization, Standing and Power.  The Buyer is organized, validly existing, and in good standing under the laws of its jurisdiction of formation and has the requisite power and authority to carry on its Business as now being conducted and to effect the transactions contemplated hereunder.

(b)     Authority.  The Buyer has the requisite power and authority to execute and to deliver this Agreement and the Ancillary Documents to which it is or will be a party and to perform its obligations hereunder and under any such Ancillary Documents.  The execution and delivery by the Buyer of this Agreement and the Ancillary Documents to which it is or will be a party, the performance of its obligations hereunder and thereunder and the consummation by it of the transactions contemplated hereby and thereby have been (or will be at the time of execution thereof) duly authorized by all necessary limited liability company action on the part of the Buyer, and no other action on the part of the Buyer is necessary to authorize the execution and delivery of this Agreement, the Ancillary Documents or the consummation of the transactions contemplated hereby or thereby.  This Agreement has been duly and validly executed and delivered by the Buyer and constitutes a valid and binding obligation of the Buyer, enforceable against the Buyer in accordance with its terms, subject (a) to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies and (b) to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).  Each of the Ancillary Documents, when executed and delivered by the Buyer, shall constitute a valid and binding agreement of the Buyer, enforceable against the Buyer in accordance with its terms, subject (i) to applicable bankruptcy, insolvency, fraudulent conveyance, reorganization, moratorium and similar laws affecting creditors' rights and remedies generally and (ii) as to enforceability, to general principles of equity (regardless of whether enforcement is sought in a proceeding at law or in equity).

(c)     Consents and Approvals; No Violation.  The execution and delivery of this Agreement by the Buyer do not, and the consummation of the transactions contemplated hereby and compliance with the provisions hereof will not, result in any violation of, or default (with or without notice or lapse of time, or both) under, or give to others a right of termination, cancellation or acceleration of any obligation or the loss of a material benefit under, or result in the creation of any Lien upon any of the properties or assets of the Buyer under, any provision of (a) the Buyer's Charter Documents, (b) any loan or credit agreement, note, bond, mortgage, indenture, lease or other agreement, instrument, permit, concession, franchise or license applicable to the Buyer, or (c) any Applicable Laws, other than, in the case of clauses (b) or (c), any such violations, defaults, rights or Liens that, individually or in the aggregate, would not prevent the consummation of any of the transactions contemplated hereby in accordance with the

18

terms of this Agreement.  Except for the Governmental Approvals, no filing or registration with, or authorization, consent or approval of, any Governmental Authority is required by or with respect to the Buyer in connection with the execution and delivery of this Agreement by the Buyer or is necessary for the consummation of the transactions contemplated by this Agreement.

(d)     <u>Actions and Proceedings</u>.  There are no actions, suits, labor disputes or other litigation, legal or administrative proceedings or governmental investigations pending or, to the knowledge of the Buyer, threatened against or affecting the Buyer or any of its present or former officers, directors, employees, consultants, agents or shareholders, as such, or any of its properties, assets or business relating to the transactions contemplated by this Agreement or which could have the effect of delaying or prohibiting the consummation of the transactions contemplated by this Agreement.

(e)     <u>Brokers</u>.  No broker, investment banker or other person engaged by the Buyer is entitled to any broker's, finder's or other similar fee or commission payable by the Seller in connection with the transactions contemplated by this Agreement based upon arrangements made by or on behalf of the Buyer.

(f)     <u>Financing</u>.  At the Closing, the Buyer shall have sufficient cash or other sources of immediately available funds to enable it to consummate the transactions contemplated hereunder.

(g)     **<u>AS IS SALE</u>.  THE BUYER UNDERSTANDS THAT, EXCEPT AS SPECIFICALLY SET FORTH IN ARTICLE 4 OF THIS AGREEMENT, THE SELLER IS NOT AND WILL NOT BE MAKING ANY REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AND THAT THE PURCHASED ASSETS, THE ASSUMED LIABILITIES AND THE BUSINESS BEING TRANSFERRED TO BUYER ARE TO BE CONVEYED HEREUNDER "AS IS, WHERE IS" ON THE CLOSING DATE, AND IN THEIR THEN EXISTING CONDITION. IN ENTERING INTO THIS AGREEMENT, BUYER IS RELYING UPON BUYER'S OWN DUE DILIGENCE INVESTIGATION AND EXAMINATION OF THE PURCHASED ASSETS AND THE ASSUMED LIABILITIES. EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN ARTICLE 4 OF THIS AGREEMENT, SELLER IS NOT MAKING ANY WARRANTY OF MERCHANTABILITY, SUITABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR QUALITY, WITH RESPECT TO ANY OF THE TANGIBLE ASSETS BEING TRANSFERRED, OR AS TO THE CONDITION OR WORKMANSHIP THEREOF OR THE ABSENCE OF ANY DEFECTS THEREIN, WHETHER LATENT OR PATENT.**

6.
COVENANTS

(a)     [INTENTIONALLY LEFT BLANK].

(b)     <u>Operation of Business</u>.  Except as contemplated by this Agreement and to the extent not inconsistent with the Bankruptcy Code, the operation and information reporting requirements of the Office of the United States Trustee (the "<u>UST</u>"), and subject to any Order or direction of the Bankruptcy Court, during the period from the date of this Agreement to the

19

Closing, the Seller shall operate the Purchased Assets and conduct the Business in the ordinary course of business consistent with prudent business practices and in material compliance with Applicable Laws, and to the extent consistent therewith so as to preserve the current value and integrity of the Business and the Purchased Assets, (i) pay all post-petition Taxes as they become due and payable, (ii) purchase, maintain and grow Inventory, supplies and spare parts at customary operation levels consistent with past operating practices, (iii) maintain in full force and effect the existence of all Intellectual Property consistent with past operating practices, (iv) maintain insurance on the Purchased Assets (in amounts and types consistent with past practice), (v) fund budgeted capital expenditures and customer rebates consistent with past practice and (vi) use its reasonable best efforts to preserve the goodwill and organization of the Business and its relationships with customers, suppliers and others having business dealings with it consistent with past operating practices.  Without limiting the generality of the foregoing, prior to the Closing and subject to the requirements of the Bankruptcy Code, the UST, and any Orders entered by the Bankruptcy Court, the Seller shall not, and shall cause its officers, directors, employees, representatives and agents not to:

(i)     except in connection with Alternative Transactions, enter into any Material Contract that may be included in the Purchased Assets or make a material adverse change or modification to any existing Material Contract included in the Purchased Assets, except for agreements relating to sales of Inventory and purchases of Inventory from suppliers in the ordinary course of business and consistent with past practices;

(ii)     except in connection with Alternative Transactions, sell, lease, dispose of or otherwise distribute any material portion of the Purchased Assets, except for sales, leases, dispositions and distributions of Inventory in the ordinary course of business and consistent with past practices;

(iii)     mortgage or pledge any of the Purchased Assets or subject any Purchased Assets to any Lien, other than Permitted Liens;

(iv)     unless agreed to by the Buyer in writing, increase in any material manner the salary, bonus, severance or other compensation or benefits of any member of management or other Employee, except for any annual and usual increases in salary to any Employee consistent with past operating practices;

(v)     unless agreed to by the Buyer in writing, enter into any employment Contract with any Employee, adopt any benefit plan for any Employees or amend or modify any existing Employee Benefit Plan for any Employees;

(vi)     take or omit to take any action that would require disclosure under Article 4 or that would otherwise result in a breach of any of the representations, warranties or covenants made by the Seller in this Agreement or in any of the agreements contemplated hereby;

(vii)     take any action or omit to take any action which act or omission would reasonably be anticipated to have a Material Adverse Effect on the Business or the Purchased Assets;

(viii)    unless agreed to by the Buyer, cancel, release, waive or compromise any debt, Claim or right in its favor having a value in excess of $25,000, or $50,000 in the aggregate, other than in connection with returns of Inventory for credit or replacement in the ordinary course of business;

(ix)    pay any dividends or make any distributions to its members or redeem, repurchase or otherwise acquire any Capital Stock;

(x)    accelerate, delay or otherwise modify any of the Seller's shipping, billing or collection practices, except that the Seller may seek approval from the Bankruptcy Court to participate in the Seller's customer's financing programs if the Seller requires additional working capital in the ordinary course, provided that the Seller shall not enter into or agree to enter into any such program, agreement or similar arrangements prior to the Closing; or

(xi)    agree in writing or otherwise to take any of the foregoing actions.

Additionally, from the date of this Agreement to the Closing Date, the Seller shall promptly consult with the Buyer about any material matters concerning the Purchased Assets or the Business.

(c)    <u>Notification</u>.  Prior to the Closing, the Seller shall notify the Buyer, and the Buyer shall notify the Seller, of any litigation, arbitration, appeal or administrative proceeding pending, or, to its knowledge, threatened against the Seller or the Buyer, as the case may be, which challenges the transactions contemplated hereby.

(d)    <u>All Reasonable Efforts</u>.  Without limiting the ability of either party to use discretion in exercising its rights pursuant to this Agreement, prior to the Closing, each of the parties shall use reasonable efforts to (a) satisfy promptly all conditions required hereby to be satisfied by such party in order to expedite the consummation of the transactions contemplated hereby and (b) take, or cause to be taken, all action, and to do, or cause to be done, as promptly as practicable, all things necessary, proper or advisable under Applicable Laws to consummate and make effective as promptly as practicable the transactions contemplated by this Agreement.

(e)    <u>Further Assurances</u>.  From time to time from and after the date of this Agreement, including following the Closing, the Buyer and the Seller shall each execute, acknowledge and deliver such additional documents or instruments and take such other action as the Buyer or the Seller, as the case may be, may reasonably request to more effectively accomplish the transactions contemplated by this Agreement.

(f)    <u>Publicity</u>.  The parties hereto shall consult with each other and shall mutually agree (the agreement of each party not to be unreasonably withheld or delayed) upon the content and timing of any press release or other public statements with respect to the transactions contemplated by this Agreement and shall not issue any such press release or make any such public statement prior to such consultation and agreement, except as may be required by Applicable Laws or in connection with the Bankruptcy Case; provided, however, that to the extent reasonably possible, each party shall give prior notice to the other parties of the content and timing of any such press release or other public statement required by Applicable Laws.

(g)     Confidentiality. Except as required by Applicable Law, the schedules annexed hereto shall not be disclosed to any Person that has not executed a confidentiality agreement with the Debtor or its Representatives without the prior consent of each of the parties hereto.

(h)     Transaction Taxes.  The Buyer and the Seller shall cooperate in the preparation and timely delivery of any certificate or instrument that would entitle either party to claim an exemption from any state and local transfer, recording, stamp and other transfer or transaction Tax that may be imposed by reason of the transactions contemplated by this Agreement (collectively, "Transaction Taxes").  To the extent a Transaction Tax is still payable after giving effect to any available exemption, the Seller shall pay the Transaction Taxes, if any.  The Buyer will provide such resale certificates as the Seller may reasonably request with respect to Inventory items included within the Purchased Assets.

(i)     Notice of Nonsatisfaction of Closing Condition.  The Buyer and the Seller shall, within three (3) Business Days of discovery thereof, notify the other party of any fact or circumstance that would cause (a) its representations and warranties to be untrue, (b) its covenants to be unlikely to be fulfilled prior to or on the Closing Date or (c) the conditions in Section 8(a) to be unsatisfied; provided, however, that inclusion or omission of any such fact, circumstance or condition in or from any such written notification shall not be deemed a waiver of any rights under this Agreement, and shall not alter or otherwise affect the representations, warranties, covenants, conditions or agreements contained in this Agreement.

(j)     Cooperation.  The Buyer shall reasonably cooperate with the Seller in furnishing to the Bankruptcy Court evidence of adequate assurance by the Buyer of its future performance under the Assumed Contracts, and to otherwise perform and discharge the Assumed Liabilities, and evidence that the Buyer has the financial wherewithal to timely close the transactions contemplated by this Agreement.  In addition, the Buyer shall reasonably cooperate with the Seller in the Seller's efforts to obtain the approval of the Sale Order.

(k)     Access to Records.  From and after the Closing Date, the Seller on the one hand and the Buyer on the other hand shall afford each other and their respective counsel, accountants and other representatives such access to records in respect of the Seller Business which, after the Closing, are in the custody or control of the other party and which such party reasonably requires in order to comply with its obligations under Applicable Law, including audits by Tax authorities, or which the Buyer reasonably requires to comply with its material obligations under the Assumed Liabilities or the Assumed Contracts.  In connection therewith, the Buyer, at its sole cost and expense, will retain the Books and Records, and all other records that the Buyer may have, if any, relating and material to the operation of the Business and the Purchased Assets, for a period of two (2) years after the Closing Date and, during such period, shall grant, at no charge, to Seller and its successors and assigns (including any subsequently appointed trustee) reasonable access to the Books and Records, and such other records, for reasonable purposes.

(l)     Notice of Sale.  Notice of this Agreement and notice of the Sale Order and the hearings therefor shall be duly and properly given by the Seller by actual notice to all known creditors and known parties in interest in the Bankruptcy Case, including any known parties holding consensual or nonconsensual Liens on the Purchased Assets, the lessors on the material

22

leases, the non-Seller parties to the Assumed Contracts being assumed pursuant to this Agreement, the employees of the Business, and applicable taxing and Governmental Authorities.

7.

EMPLOYEE MATTERS

(a)    Personnel; Transferred Employees.  If the Buyer is the Winning Bidder, prior to the Closing the Buyer shall offer employment on an "at will" basis commencing after the Closing, to only those Employees who are full time and current.  The Seller shall reasonably assist the Buyer in effecting an orderly change of employment of such Employees who accept offers of employment by the Buyer pursuant to this Section 7(a) (collectively, the "Transferred Employees").  The compensation and benefits provided by the Buyer to the Transferred Employees shall be in the aggregate substantially equivalent to the compensation and benefits provided to the Transferred Employees by the Seller prior to Closing.  The Seller shall ensure that the Sale Order provides a release of all of the personal guarantees of the Transferred Employees of any Indebtedness of the Seller.

(b)    COBRA and Health Claim Data.  The Seller shall provide all notices and fulfill all of its obligations, if any, under Section 4980B(f) of the Code or Part 6 of Subtitle B of Title I of ERISA ("COBRA") with respect to the Transferred Employees and all current and former Employees.  Notwithstanding anything to the contrary, on and after the later of (a) any date on which the Seller and each Commonly Controlled Entity cease to provide such notices and fulfill such obligations with respect to any Employee or (b) the Closing Date, with respect to qualifying events (as defined by COBRA) occurring on or before the Closing Date, the Buyer shall have sole responsibility for satisfying the continuation coverage requirements for group health plans under COBRA for all "M&A qualified beneficiaries" (as defined in Q&A-4 of Treasury Regulation Section 54.4980B-9) related to the Business.

(c)    WARN.  The Seller shall have sole responsibility for any obligations or liabilities of the Seller under the Worker Adjustment and Retraining Notification Act ("WARN"), or any similar Applicable Law under any other applicable jurisdiction, with respect to the Employees, and shall indemnify, defend and hold harmless the Buyer with respect to any such obligations and liabilities.

(d)    Welfare Benefits.  In addition to any requirements under COBRA, the Buyer will be responsible for all claims for health, accident, sickness, and disability benefits that are incurred after the Closing Date by Transferred Employees or their eligible dependents.  Except as may be required under COBRA, the Buyer shall have no obligation or responsibility for any claims for health, accident, sickness, workers' compensation and disability benefits (a) that are incurred prior to or on the Closing Date by any Transferred Employees or their eligible dependents, or (b) for any reason or purpose, in the case of Employees or their eligible dependents who are not Transferred Employees or related to Transferred Employees.  As of the Closing, any Employee who is receiving benefits under the Seller's short-term or long-term disability program shall be deemed to not be a Transferred Employee.  If such Employee will be returning to work on a full time basis, such Employee may become employed by the Buyer only at the Buyer's option.

23

(e)     Vacations.  As of the Closing Date, vacation for the Transferred Employees shall be governed by the Buyer's vacation policies.  However, the Buyer shall honor any of the Transferred Employees' original dates of hire with the Seller and provide credit, under the Buyer's applicable vacation policies, for the Transferred Employees' years of service with the Seller.

(f)     Employee Benefit Plans – Seller's Liability.  With respect to any Transferred Employees, any other former or current Employees of the Seller or their respective beneficiaries, and except as provided in this Article 7, the Buyer shall not be responsible for or assume (a) any liabilities incurred by the Seller as a result, directly or indirectly, of any breach by the Seller, any fiduciary or administrator, or other Person of their obligations or duties under or with respect to any Employee Benefit Plans; and (b) any severance obligations of the Seller with respect to the termination, discharge or constructive termination or discharge by the Seller of the Transferred Employees' or such other Employees' employment with the Seller.  The Buyer shall not be responsible for and shall not assume any claim, benefit, liability or obligation under or with respect to any of the Employee Benefit Plans and, except as provided in Sections 7(e) and 7(f), the Seller and its insurers shall be exclusively liable for any and all such claims, benefits, liabilities and obligations described in this Section 7(f).  Before and after the Closing Date, the Seller shall be exclusively responsible for the payment, sponsorship, funding, operation, investment, administration, or benefits with respect to all Employee Benefit Plans.

(g)     Wage Reporting.  The Buyer and the Seller shall, before the Closing Date, agree upon the method of the reporting of wages and the method used shall be one of the procedures permitted by the Internal Revenue Service.

(h)     Unemployment Compensation.  Upon the Buyer's written request, to the extent permitted by Applicable Law, the Seller and the Buyer shall jointly file an agreement or other document or instrument, in form and substance satisfactory to the parties, with the appropriate state authorities for the purpose of transferring to the Buyer the Seller's unemployment compensation experience rating for the Transferred Employees as of the Closing Date.

(i)     Employee Rights.  All provisions contained in this Agreement with respect to Employee Benefit Plans or compensation of Transferred Employees are included for the sole benefit of the respective parties hereto.  Nothing contained herein shall (a) confer upon any former, current or future employee of the Seller or the Buyer or any legal representative, dependent or beneficiary thereof any rights or remedies, including any right to employment or continued employment, of any nature, for any specified period, (b) cause the employment status of any former, present or future employee of the Buyer to be other than terminable at will or (c) confer any third party beneficiary rights upon any Transferred Employee or any dependent or beneficiary thereof or any heirs or assigns thereof.

(j)     Prior Service Recognized.  With respect to a Transferred Employee's participation in any medical plan, vacation policy, or plan intended to be qualified under Section 401(a) of the Code on or after the Closing Date, the Buyer agrees that for purposes of eligibility and vesting (but not for benefit accruals), credit will be given to the Transferred Employees for service previously credited under similar employee benefit plans, policies or arrangements of the Seller.

24

8.
CONDITIONS TO THE OBLIGATIONS OF THE PARTIES

(a)    Conditions to Each Party's Obligations.  The respective obligations of each party to effect the transactions contemplated by this Agreement, unless waived by the other parties hereto, shall be subject to the fulfillment, on or prior to the Closing Date, of the following conditions:

(i)    No Order, writ, injunction or decree shall have been entered and be in effect that restrains, enjoins or invalidates, or otherwise materially and adversely affects the transactions contemplated by this Agreement, and no action, suit or other proceeding shall be pending that has a reasonable likelihood of resulting in any such Order, writ, injunction or decree.

(ii)    The Bankruptcy Court shall have entered the Sale Order in a form acceptable to the Buyer approving the transactions contemplated hereby and the terms and conditions of this Agreement, finding that notice of the hearing concerning approval of the transactions contemplated hereunder was given in accordance with the Bankruptcy Code and constitutes such notice as is appropriate under the particular circumstances, and the Buyer is a "good faith" purchaser entitled to the protections afforded by Section 363(m) of the Bankruptcy Code, providing for the sale of the Purchased Assets free and clear of all Claims (other than Assumed Liabilities) and Liens.  A Sale Order in substance in the form of Exhibit I shall be deemed acceptable to the Buyer.

(b)    Conditions to Obligations of the Buyer.  The obligations of the Buyer under this Agreement to consummate the transactions contemplated hereby to be consummated at the Closing shall be subject to the satisfaction, at or prior to the Closing, of the following conditions, which may be waived in writing by the Buyer in its sole discretion:

(i)    all representations and warranties of the Seller in Article 4 of this Agreement shall be true and complete in all respects (with respect to representations and warranties qualified or limited by materiality) or in all material respects (with respect to representations and warranties not so qualified or limited), in each case, when made and on and as of the Closing Date as if made on and as of the Closing Date, other than any such representations or warranties that expressly speak only as of an earlier date, which shall be true and complete in all respects or all material respects, as applicable, as of such earlier date;

(ii)    the Seller shall have executed and delivered the documents required to be executed and delivered by it pursuant to Section 3(d)(ii) hereof;

(iii)    all of the terms, covenants and conditions to be complied with and performed by the Seller on or prior to the Closing Date shall have been complied with or performed in all material respects;

(iv)    the Bankruptcy Court shall have entered orders satisfactory to the Buyer in its reasonable discretion, approving the sale of the Purchased Assets by the Seller to the Buyer, and the assumption and assignment by the Seller of the Assumed Contracts to the Buyer, and such orders shall have become Final Orders;

25

(v)　　[INTENTIONALLY LEFT BLANK];

(vi)　　[INTENTIONALLY LEFT BLANK]; and

(vii)　　the Bankruptcy Court shall not have entered or approved any order that would directly or indirectly increase the Purchase Price hereunder (e.g. increasing the Assumed Liabilities, decreasing the Purchased Assets, requiring the Buyer to pay or assume expenses or costs, etc.).

(c)　　<u>Conditions to Obligations of the Seller</u>.  The obligations of the Seller under this Agreement to consummate the transactions contemplated hereby to be consummated at the Closing shall be subject to the satisfaction, at or prior to the Closing, of all of the following conditions, any one or more of which may be waived in writing by the Seller in its sole discretion:

(i)　　all representations and warranties of the Buyer in Article 5 of this Agreement shall be true and complete in all respects (with respect to representations and warranties qualified or limited by materiality) or in all material respects (with respect to representations and warranties not so qualified or limited), in each case, when made and on and as of the Closing Date as if made on and as of the Closing Date, other than any such representations or warranties that expressly speak only as of an earlier date, which shall be true and complete in all respects or all material respects, as applicable, as of such earlier date;

(ii)　　The Buyer shall have executed and delivered the documents required to be executed and delivered and made the payments required to be made by it pursuant to Section 3(d)(i) hereof; and

(iii)　　all of the terms, covenants and conditions to be complied with and performed by the Buyer on or prior to the Closing Date shall have been complied with or performed in all material respects.

9.
TERMINATION

(a)　　<u>Termination</u>.　This Agreement may be terminated and the transactions contemplated hereby may be abandoned at any time prior to the Closing:

(i)　　by mutual written consent of the Seller and the Buyer;

(ii)　　by the Buyer:

(A)　　if, on or before February 15, 2011, all of the conditions in Section 7.1 and Section 7.3 have been satisfied, and the Seller fails to consummate the transactions contemplated by this Agreement in accordance with the terms hereof;

(B)　　if the Bankruptcy Court has not entered the Sale Order and such order does not become a Final Order by February 15, 2011, or the Sale Order is entered by such date but (A) is stayed by order of the Bankruptcy Court or of

26

some other federal district or appeals court (and such stay is not terminated by February 15, 2011) or (B) ceases to be effective and is not reinstated by February 15, 2011;

(C)    upon the conversion of the Bankruptcy Case to a case under Chapter 7 of the Bankruptcy Code, the dismissal of the Bankruptcy Case, or any similar commencement of liquidation proceedings relating to the Seller, other than as contemplated herein;

(D)    if the Closing does not occur on or before February 15, 2011, unless the failure to consummate the Closing is solely due to the failure of the Buyer to perform any of its obligations under this Agreement to the extent required to be performed by the Buyer on or prior to the Closing Date;

(E)    if the Seller executes, or seeks approval from the Bankruptcy Court of, an Alternative Agreement;

(F)    if any event, circumstance, condition, fact, effect or other matter has occurred or exists which would, or would be reasonably likely to, give rise to the failure of any of the conditions to the obligations of the Buyer set forth in Section 8(a) or Section 8(b);

(G)    if the Buyer is not determined to have the highest and best bid at the Auction pursuant to the Bidding Procedures Order;

(H)    if the Seller has not used its reasonable commercial best efforts to have the Sale Order become a Final Order by February 15, 2011; or

(I)    [INTENTIONALLY LEFT BLANK].

(iii)    by the Seller:

i.    if all of the conditions in Section 8(a) and Section 8(b) have been satisfied, and the Buyer fails to consummate the transactions contemplated by this Agreement on or before February 15, 2011 in accordance with the terms hereof;

ii.    if the Bankruptcy Court has not entered the Sale Order by February 15, 2011, or the Sale Order is entered by such date but (A) is stayed by order of the Bankruptcy Court or of some other federal district or appeals court (and such stay is not terminated by February 15, 2011) or (B) ceases to be effective and is not reinstated by February 15, 2011;

iii.    if the Closing does not occur on or before February 15, unless the failure to consummate the Closing is due to the failure of the Seller to perform any of its obligations under this Agreement to the extent required to be performed by the Seller on or prior to the Closing Date;

iv.    if the Seller executes an Alternative Agreement;

      v.      if any event, circumstance, condition, fact, effect or other matter has occurred or exists which would, or would be reasonably likely to, give rise to the failure of any of the conditions to the obligations of the Seller set forth in Section 8(a);

      vi.      if any event, circumstance, condition, fact, effect or other matter has occurred or exists which would, or would be reasonably likely to, give rise to the failure of any of the conditions to the obligations of the Seller set forth in Section 8(c);or

      vii.      if the Buyer fails to timely deliver the Deposit, as required by Section 3(a)(ii).

      (b)      <u>Procedure and Effect of Termination</u>.  In the event of termination of the transactions contemplated hereby pursuant to Section 9(a), written notice thereof shall forthwith be given to the other party to this Agreement, and this Agreement shall terminate (subject to the provisions of this Section 9(b), Section (c) and Section (d)) and the transactions contemplated hereby shall be abandoned, without further action by either of the parties hereto.  If this Agreement is terminated as provided herein:

      (i)      upon request therefor, each party shall redeliver all documents, work papers and other material of any other party relating to the transactions contemplated hereby, whether obtained before or after the execution hereof, to the party furnishing the same; and

      (ii)      no party hereto shall have any liability or further obligation under this Agreement, except that the provisions of Sections 6(g), 9(b), (c), (d), 10(n), 10(o) and 10(p) shall survive any termination and remain in full force and effect.

      (c)      <u>Buyer's Exclusive Remedy</u>.  If this Agreement is terminated pursuant to Sections 8.1(a), 8.1(b)(i)-(viii) or 8.1(c)(ii)-(v), without further order of the Bankruptcy Court the Deposit shall be returned to the Buyer in accordance with the Escrow Agreement.

      (d)      <u>The Seller's Remedy</u>.  If the Seller terminates this Agreement pursuant to Sections i, v or vii, the Seller shall be entitled to elect as its sole and exclusive remedy either (i) retaining the Deposit as liquidated damages and not a penalty, which shall be paid to the Seller in accordance with the Escrow Agreement and without further order of the Bankruptcy Court or (ii) maintaining an action for specific performance of the terms of this Agreement.  In the event that the Seller elects to but is unable to obtain specific performance of the terms of this Agreement due to an intentional act of the Buyer, Seller will be entitled to pursue an action for damages against the Buyer.  In addition, if the Buyer intentionally breaches this Agreement in a manner designed to prevent an action for specific performance, then in such event, Seller shall also be entitled to reimbursement of all third party costs and expenses incurred by Seller in connection with the execution of this Agreement and the investigations and other activities pursued by Seller in connection herewith.

10.
GENERAL PROVISIONS

(a)    <u>Survival of Representations and Warranties</u>.  The representations and warranties set forth in this Agreement or in any schedule, exhibit or instrument delivered pursuant to this Agreement by the Seller shall terminate upon Closing.

(b)    <u>Notices</u>.  All notices, requests, demands and other communications hereunder (a "<u>Notice</u>") shall be in writing and deemed to be duly given, (a) when delivered by hand, with a record of receipt, (b) the fourth day after mailing, if mailed by certified or registered mail, return receipt requested with postage prepaid, (c) the day delivered by a nationally recognized overnight courier, with a record of receipt, or (d) the day of transmission, with confirmation of receipt, if delivered by facsimile or telecopy during regular business hours (which regular business hours shall be 9:00 am – 5:00 pm on each Business Day), or the day after transmission, with confirmation of receipt, if delivered by facsimile or telecopy after regular business hours, to the parties at the following addresses or telecopy numbers (or to such other address or telecopy number as a party may have specified by the notice given to the other party pursuant to this provision):

|  |  |
|---|---|
| If to Seller: | First Foliage, L.C.<br>17800 Southwest 268th Street<br>Homestead, FL 33031-2234<br>Attn: Jose Garces, CEO |
| And a copy to: | Infante, Zumpano, Hudson & Miloch, LLC<br>500 South Dixie Highway, Suite 302<br>Coral Gables, Florida  33146<br>Attn: Luis Salazar, Esq.<br>Facsimile:  (305) 774-5908 |
| If to the Buyer: | Costa Farms, LLC<br>22290 S.W. 162 Avenue<br>Goulds, Florida 33170<br>Attn:  Arianna Cabrera Arana, Esq. |
| And a copy to: | Kozyak Tropin & Throckmorton, P.A.<br>2525 Ponce De Leon, 9th Floor<br>Miami, Florida 33134<br>Attn.:  Corali Lopez-Castro, Esq. |

or to such other addresses as either party may provide to the other in writing.  Notices hereunder (which shall not constitute notice) shall also be provided to the Official Committee of Unsecured Creditors of the Seller, c/o Berger Singerman, P.A., 200 South Biscayne Boulevard, Suite 1000, Miami, Florida 33131, Attn:  Jordi Guso, Facsimile: (305) 755-9500.

(c)      Section and Other Headings.    Section or other headings contained in this Agreement are for reference purposes only and shall not affect in any way the meaning or interpretation of this Agreement.

(d)      Waiver.  Any term or condition of this Agreement may be waived at any time by the party that is entitled to the benefit thereof, but no such waiver shall be effective unless set forth in a written instrument duly executed by or on behalf of the party waiving such term or condition.  No waiver by any party of any term or condition of this Agreement, in any one or more instances, shall be deemed to be or construed as a waiver of the same or any other term or condition of this Agreement.  All remedies, either under this Agreement or by Applicable Law or otherwise afforded, will be cumulative and not alternative.

(e)      Entire Agreement; Disclosure Schedules.    This Agreement, which includes the annex, exhibits and schedules hereto, supersedes any other agreement, whether written or oral, that may have been made or entered into by any party relating to the matters contemplated hereby and constitutes the entire agreement by and among the parties hereto.

(f)      Amendments, Supplements, Etc.    This Agreement may be amended or supplemented at any time by additional written agreements as may mutually be determined by the Buyer and the Seller to be necessary, desirable or expedient to further the purposes of this Agreement or to clarify the intention of the parties.

(g)      No Rights of Third Parties.  Nothing expressed or implied in this Agreement is intended or shall be construed to confer upon or give any Person other than the parties hereto any rights or remedies under or by reason of this Agreement or any transaction contemplated hereby.

(h)      Enforcement.  The laws of the State of Florida shall govern the interpretation, validity, performance and enforcement of this Agreement, without reference to any conflict of law or choice of law provisions therein.

(i)      Invalid Provisions.  If any provision of this Agreement (other than Article 9 of this Agreement or any part or provision thereof) is held to be illegal, invalid, or unenforceable under any present or future Applicable Law, and if the rights or obligations under this Agreement of the Seller on the one hand and the Buyer on the other hand will not otherwise be materially and adversely affected thereby, (a) such provision shall be fully severable, (b) this Agreement shall be construed and enforced as if such illegal, invalid, or unenforceable provision had never comprised a part hereof, (c) the remaining provisions of this Agreement shall remain in full force and effect and shall not be affected by the illegal, invalid, or unenforceable provision or by its severance from this Agreement, and (d) in lieu of such illegal, invalid, or unenforceable provision, there shall be added automatically as a part of this Agreement a legal, valid, and enforceable provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible.

(j)      Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors (including any trustee, receiver, receiver-manager, interim receiver or similar officer appointed for the Seller) and permitted assigns, but shall not be assignable or delegable (a) by the Seller without the prior written

consent of the Buyer or by court order, or (b) by the Buyer without the prior written consent of the Seller or by court order; provided, however, that the Buyer may assign, convey, transfer or otherwise dispose of all or any portion of its interest in, or its rights and obligations under, this Agreement and the Ancillary Agreements to (i) one or more Affiliates of the Buyer as specified by the Buyer or (ii) any financial institution or other lender financing or refinancing the transactions contemplated hereby or otherwise extending credit to the Buyer, or its Affiliates and all the Buyer's rights shall inure to the benefit of and shall be enforceable by such Affiliate, financial institution or other lender.

(k)     Counterparts.  This Agreement may be executed in any number of counterparts, all of which taken together shall constitute one and the same instrument and either of the parties hereto may execute this Agreement by signing any such counterpart.

(l)     Facsimile Signature.  This Agreement may be executed and accepted by facsimile signature or by other electronic means (including Adobe's Portable Document Format) and any such signature shall be of the same force and effect as an original signature.

(m)     Further Assurances.  Both parties agree that either will execute such further documentation or take such further actions as the other party may reasonably request to effectuate the transfer of the Purchased Assets and implement this Agreement.

(n)     Fees and Expenses.  Except as otherwise provided herein, all costs and expenses incurred in connection with this Agreement and the transactions contemplated hereby including the fees and disbursements of counsel, financial advisors and accountants, shall be paid by the party incurring such costs and expenses.  The Seller shall bear all of the costs of the Bankruptcy Case.

(o)     WAIVER OF JURY TRIAL.  THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE ANY RIGHT TO TRIAL BY JURY IN CONNECTION WITH ANY DISPUTE RELATED IN ANY WAY TO BUYER'S SUBMISSION OF THE BID MATERIALS OR THIS AGREEMENT.

(p)     Exclusive Jurisdiction.  Without limiting any party's right to appeal any order of the Bankruptcy Court, (a) the Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Agreement and to decide any claims or disputes that may arise or result from, or be connected with, this Agreement, any breach or default hereunder, or the transactions contemplated hereby, and (b) any and all claims, actions, causes of action, suits and proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court and shall receive notices at such locations as indicated in Section 10(b) hereof.

(q)     Computation of Days.  In computing any time period prescribed or allowed in this Agreement, the day of the act, event or default from which the designated period of time begins to run shall not be included.  The last day of the period so computed shall be included, unless it is not a Business Day, or, when the act to be done is the filing of a paper in court, a day on which weather or other conditions have made the clerk's office inaccessible, in which event the period runs until the end of the next day which is not one of the aforementioned days.

(r)     <u>No Consequential or Punitive Damages</u>.  No party hereto (or its Affiliates) shall, under any circumstance, be liable to any other party (or its Affiliates) for any consequential, exemplary, special, incidental or punitive damages claimed by such other party under the terms of or due to any breach of this Agreement, including loss of revenue or income, cost of capital, or loss of business reputation or opportunity.

(s)     <u>Time of Essence</u>.  With regard to all dates and time periods set forth or referred to in this Agreement, time is of the essence.

**[The remainder of this page has intentionally been left blank.]**

32

IN WITNESS WHEREOF, the parties have executed this Asset Purchase Agreement as of the date set forth above.

**FIRST FOLIAGE, L.C.**

By: _____

Name: _____

Title: _____


**COSTA FARMS, LLC**

By: _____

Name: _____

Title: _____